Ruben **FOSTER**, et al., Plaintiffs,

v.

**FULTON COUNTY, GEORGIA,**
et al., Defendants.

No. CIV.A.1:99–CV–900–MHS.

United States District Court,
N.D. Georgia,
Atlanta Division.

April 16, 2002.
Order Amending Decision April 18, 2002.

Stephen Brooks Bright, Robert Earl Toone, Jr., Katharine Aiken Huffman, Tamara H. Serwer, Alexander Taylor Rundlet, X–208, Southern Center for Human Rights, Atlanta, GA, Milton "Chip" Dale Rowan, Chip Rowan & Associates, Atlanta, GA, for plaintiffs.

Overtis Hicks Brantley, Charles George Hicks, Paula Morgan Nash, Rolesia Butler Dancy, Office of Fulton County Attorney, Atlanta, GA, for defendants.

## ORDER

SHOOB, Senior District Judge.

On November 5, 2001, the Court ordered the parties to respond to Dr. Greifinger's October 30, 2001, Report and to "set forth specific recommendations for addressing" each of ten areas that Dr. Greifinger identified as "far from compliance" with the Final Settlement Agreement.[1] The parties filed their responses on December 5, 2001. On January 15, 2002, the Court toured the jail with Dr. Greifinger, and after a follow-up visit on February 25–26, 2002, Dr. Greifinger submitted his latest Report on March 2, 2002.

The Court has reviewed the parties' responses, Dr. Greifinger's latest report and plaintiffs' response to that Report filed March 21, 2002, as well as defendants' most recent updates on jail population, filed March 1 and April 1, 2002. It is clear from these submissions that, despite significant progress, much remains to be done to achieve full compliance with the Final

---

1. The deficient areas identified by Dr. Greifinger were (1) crowding, (2) security staffing, (3) physical plant intake and kitchen, (4) access to Grady Hospital System, (5) timely medication to new HIV infected patients, (6) follow-up on abnormal chest x-rays, (7) continuity of care on release, (8) diets, (9) cross-training, and (10) quality management.

Settlement Agreement and to assure that all plaintiff class members receive constitutionally adequate medical care. It is also clear that these goals will not be realized without continued monitoring by Dr. Greifinger and active supervision by this Court.

The following additional steps are needed to enforce the terms of the Final Settlement Agreement and to correct violations of plaintiffs' federal rights to minimally adequate conditions of confinement and receipt of adequate medical care. The Court finds that this relief is narrowly drawn, extends no further than necessary to correct violations of federal rights arising from defendants' failure to comply with the Final Settlement Agreement, and is the least intrusive means to correct these violations. The areas where additional relief is needed, the relevant provisions of the Final Settlement Agreement, and the specific remedial actions required are set out below.

## I. *Overcrowding*

The County shall identify mechanisms for accommodating current and anticipated jail population.

Final Settlement Agreement ¶ V.D.

Inmate population at the Rice Street facility continues to exceed physical capacity by a significant number. After reaching a low of 2,266 on September 30, 2000, the population rose to 2,544 as of February 15, 2002, and was 2,526 on March 15, 2002. Although the population declined to 2,362 on March 31, 2002, even this figure is more than 100 over the facility's capacity of 2,250, and recent fluctuations suggest that it is likely to rise again. Clearly, the programs implemented by defendants to reduce the jail population to at or below capacity have not succeeded. Something more must be done.

As Dr. Greifinger has repeatedly stated, overcrowding causes a myriad of problems

that increase the likelihood of disease and interfere with the delivery of adequate medical care. The conditions described in Dr. Greifinger's latest Report are totally unacceptable. These conditions include lack of adequate heat, water, ventilation, and sanitation, all caused, at least in part, by the strain of chronic overcrowding on the facility's physical plant.

■ Defendants argue that, despite the overcrowding, the conditions of confinement and the provision of medical care still satisfy constitutional requirements. The Court rejects this argument. The Constitution prohibits depriving inmates of "basic human needs" or "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Adequate heat, water, fresh air, and sanitation are basic human needs, which inmates may not be denied without violating minimal constitutional requirements.

Defendants report that they have undertaken the following additional steps designed to reduce the jail population: (1) regular review of misdemeanor inmates for possible release, (2) expansion of the number and type of cases handled through the Complaint Room, (3) increased efforts to place convicted inmates in the state system, (4) possible reinstitution of the home arrest program, and (5) appointment of a new full-time magistrate judge to handle primarily criminal cases. While these are all steps in the right direction, there is no evidence, nor does the Court believe, that these steps alone will be sufficient to solve the problem.

■ Plaintiffs have proposed a number of measures that defendants have not yet undertaken, which are designed to correct systemic problems that result in unnecessary incarceration and thus contribute to jail overcrowding. Plaintiffs' principal proposal is that defendants be required to

provide counsel within 72 hours of arrest to all persons accused of minor offenses who cannot make bail. For the following reasons, the Court concludes that this proposal should be implemented immediately.

Much of the overcrowding at the jail is the result of persons charged with relatively minor offenses who cannot make bail and must remain in jail for weeks or even months waiting for the State Court Solicitor General to file an accusation.[2] Only after an accusation is filed are these inmates' cases placed on a calendar, and only after these inmates are finally brought to court are they provided counsel. By this time, they have often spent far more time in jail than they would ever receive as a sentence for their offenses. Under these circumstances, counsel can serve little purpose other than to handle the entering of a plea so that the inmate can finally get out of jail.

If these inmates are appointed counsel promptly after their arrest, they will have the opportunity to file bond review motions, to negotiate pleas, or simply to demand prompt attention to their cases. As a result, many of these inmates will spend only a few days in jail rather than weeks or months before their cases are even heard. This will not only help to alleviate the overcrowding at the jail; it will also save the County money spent in housing these inmates unnecessarily.[3]

■ Not only does the current treatment of individuals charged with minor offenses contribute to the serious overcrowding problem at the jail, it also constitutes a clear denial of these individuals' constitutional right to counsel. *See Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless represented by counsel). The Solicitor General contends that "[c]ounsel has always been appointed in Fulton County in cases where a defendant is sentenced to jail time."[4] This argument apparently refers to Fulton County's practice of appointing counsel at the time of arraignment. At this point, however, it is too late for an attorney to provide any real representation, since his client has likely already served more time than he or she would if found guilty. Under these circumstances, an appointed lawyer provides no professional assistance but merely serves the clerical function of processing people through court. Appointing counsel to handle a plea at this point is, as plaintiffs' counsel puts it, "a meaningless and hollow gesture." The Constitution requires more than this.

Accordingly, the Court ORDERS defendants to immediately implement a program to provide counsel within 72 hours of

---

**2.** According to defendants' latest report, as of March 15, 2002, there were 308 inmates in the Fulton County Jail who were charged with misdemeanors but had not yet been formally accused. Of that number, 88 had been in jail for more than 30 days, and of those, 12 had been in jail for more than 60 days.

**3.** In an April 5, 2002, letter to the Solicitor General, plaintiff's counsel provides several examples. One inmate, Barbara Anholt, spent 68 days in jail for public drunkenness, at a cost to the County of over $3,000, while her case was being "reviewed and drafted." Another inmate, Bobby Nelson Richard, spent

83 days in jail for public drunkenness, at a cost to the County of $3,735, because of "researching for other warrants." An examination of a random sample of 57 detainees being held only on State Court charges who were on the jail calendars for a single week in February revealed that they spent a total of 1,519 days in jail at a cost to Fulton County of $68,355 ($45 a day).

**4.** The Solicitor General's argument is contained in her March 18, 2002, response to a letter from plaintiffs' counsel expressing concern over Fulton County's denial of counsel to persons charged with minor offenses.

arrest to all persons accused of minor offenses who cannot make bail.

Plaintiffs have also proposed additional measures to address the overcrowding problem. The Court concludes that each of these measures is a reasonable and necessary step in identifying and correcting the problems that lead to unnecessary incarceration and jail overcrowding. Accordingly, the Court ORDERS defendants to immediately implement each of the following measures:

(1) Expand the authority of Pretrial Services to include supervision of persons arrested for misdemeanor offenses; [5]

(2) Evaluate the factors currently used to exclude certain persons charged with felonies from pretrial release and eliminate any that are unreasonable;

(3) Ensure that all persons charged with misdemeanors are offered a *reasonable* bond in accordance with Georgia law;

(4) Develop and implement meaningful mental health diversion and mental health discharge planning; [6]

(5) Increase compensation paid to appointed counsel in misdemeanor cases from the current $50 to a reasonable amount, or expand the Fulton County Public Defenders Office to handle cases in State Court;

(6) Institute an All–Purpose Hearing calendar in State Court modeled on the hearings currently conducted in Superior Court, with the hearings to be held within 72 hours of arrest; [7]

(7) Expand the authority of the Judicial Administrative Expeditors to facilitate release of inmates whose cases are in State Court as well as Superior Court;

(8) Impose reasonable restrictions on the length of time a person may remain in jail (a) without accusation or indictment, and (b) accused or indicted but untried;

(9) Implement an integrated computer system that links all of the appropriate agencies in the Fulton County criminal justice system.

## II. *Security Staffing*

Fulton County defendants shall employ a sufficient number of trained correctional staff to meet the healthcare needs of HIV-positive inmates at all times. Shortages in correctional staff shall not interfere with the provision of medical care in accordance with Section III, above. The Fulton County defendants shall ensure that shortages

---

**5.** Defendants report that on August 2, 2001, Pretrial Services began expanded screening of misdemeanor cases. It is not clear, however, whether this includes actual supervision. According to plaintiffs, Pretrial Services is currently not allowed to supervise anyone whose case is in State Court. Defendants should clarify this issue.

**6.** This will require defendants (1) to determine how many inmates have a serious mental illness, the number of times they have been subject to short-term incarcerations, the types of offenses they are charged with, and their prior access to mental health services in the community; (2) to study viable models currently used in other counties and evaluate the current mental health out-patient and in-patient services available in Fulton County; and (3) to provide adequate funding to expand mental health resources in the County, if necessary. Defendants report that various Fulton County agencies have been meeting to develop a mental health diversion program and possibly establish a mental health diversion court. Defendants should move forward with these plans expeditiously.

**7.** Defendants have indicated that State Court will begin conducting All Purpose Hearings in April or May 2002. The further requirement that these hearings be held within 72 hours of arrest is consonant with the Court's order that counsel be appointed within 72 hours of arrest. As explained in plaintiffs' counsel's April 8, 2002, letter to State Court Chief Judge Thompson and Judge Newkirk, other major metropolitan courts such as New York and Washington, D.C., generally conduct such hearings within 24 hours of arrest.

in correctional staff do not prevent or delay the distribution of medications or the transport of HIV-positive inmates for any medical appointments or needed medical care, either within the facility or in the community.

Final Settlement Agreement ¶ IV.B.

More than *two* years after the Final Settlement Agreement was signed, Dr. Greifinger reports that there continues to be an insufficient number of security staff positions for the current population of inmates. Defendants state that they have consistently kept 96–97% of staff positions filled, which is above average for correctional institutions. However, given the overpopulation of inmates and the number of inmates who are HIV-positive or have other health problems, even if *all* positions were filled, there would still not be sufficient staff to assure inmates timely access to medical care. Something more must be done.

■ Accordingly, the Court ORDERS defendants to immediately develop and implement a plan to increase security staffing at the jail to the level necessary to provide timely access to medical care for the current population of inmates. The plan shall authorize and provide funding for a sufficient number of additional staff positions, taking into account normal turnover and vacancy rates, so that at any given time there will be adequate security staff available to ensure timely access to medical care.

### III. *Access to Grady Health System.*

HIV-positive inmates shall be referred in a timely manner to outside specialists in all cases when the Jail's own staff lacks the resources to treat in a timely manner the medical or mental conditions of HIV-positive inmates. Accordingly, defendants shall coordinate timely access to the Grady Hospital's Infectious Disease Program or other appropriate specialists for HIV-posi-

tive inmates and implement all necessary procedures to provide specialty consultations and specialized testing on an emergency (immediate), urgent (within three days), and routine (within four weeks) basis, as directed by medical staff including the HIV Specialist.

Final Settlement Agreement ¶ III.G.

■ In the past, inmates without a "Grady card" experienced long delays in receiving specialty care because an appointment could not be made until after a financial review, which took anywhere from three weeks to six months. Defendants claim that this problem has been resolved. In his latest report, however, Dr. Greifinger states that, although the financial review barrier may have been solved, bureaucratic problems remain for those without a card, and that the appointment making process can still take from *three weeks to six months.* This is not acceptable.

Accordingly, the Court ORDERS defendants to immediately develop and implement a plan to establish an efficient and reliable appointment system that will assure inmates timely access to specialty care.

### IV. *Timely Medication to New HIV-Positive Inmates*

If during intake screening an HIV-positive person is able to identify credibly his or her medications, the intake nurse shall obtain a verbal order from a physician and continue these medications immediately. There shall be no unreasonable disruption in the continuity of medication.

Final Settlement Agreement ¶ III.A.ii.

■ Dr. Greifinger's latest report states: "During my January visit, the timeliness of initial medication for HIV-positive inmates remains lower than acceptable. Only half of the inmates with a

credible history of HIV medications when they arrive at the jail were getting their first doses within 24 hours." Report at 4. A 50% compliance rate with this important requirement is not acceptable.[8]

Accordingly, the Court ORDERS defendants to immediately develop and implement a plan that will ensure that new HIV-positive inmates with credible medication histories receive their medication in a timely manner.

### V. *Chest X–Rays*

Defendants shall screen all incoming inmates for symptoms of tuberculosis infection immediately upon admission. Defendants shall promptly isolate, diagnose, and treat any individual with a suspicion of contagious tuberculosis. Follow-up treatment and testing shall be conducted according to the recommendations and guidelines of the Centers for Disease Control ("CDC"). Any individual who has symptoms of tuberculosis and all HIV-positive persons shall have a chest x-ray within 48 hours of intake.

Final Settlement Agreement ¶ III.M.

Plaintiffs contend that not only has there been a problem with follow-up and treatment of abnormal chest x-rays, but also a failure to provide chest x-rays to all inmates who are required to have them within 48 hours. In his latest report, Dr. Greifinger states that a new system for timely follow-up of abnormal chest x-rays has been instituted, and that the new tracking system is excellent. However, it remains unclear whether all inmates who are required to have chest x-rays within 48 hours of intake, including all HIV-positive inmates, are actually receiving them.

Accordingly, the Court ORDERS defendants to immediately take all steps necessary to ensure that all inmates who are required to be given x-rays actually receive them.

### VI. *Continuity of Care on Release*

Prior to discharge from the Jail to the community, all HIV-positive inmates shall have an appropriate discharge plan. A post-discharge appointment with an appropriate HIV medical care provider in the community shall be scheduled for every HIV-positive inmate, and each inmate shall be informed upon discharge of the date, time, and location of that appointment. If the inmate is on any prescribed medications, defendants shall provide sufficient medications to prevent gaps in the availability of those medications.

Final Settlement Agreement ¶ III.J.

In his latest report, Dr. Greifinger states that there has been "no substantial progress in the area of continuity of care on release." Report at 6. Although more HIV-positive inmates are being referred to AID Atlanta, half of the inmates are released before AID Atlanta makes contact with them. In addition, there are continuing logistical problems with providing discharged inmates with a supply of their medications. In his prior report, Dr. Greifinger also noted that there is a major problem for inmates with dual diagnoses—both HIV infection and major mental illness such as schizophrenia or bipolar disorder. A significant number of the inmates in this category had had multiple incarcerations over the previous four months. As plaintiffs point out, "[t]his high rate of re-incarceration of seriously

---

**8.** By the time of Dr. Greifinger's February visit, defendants had eliminated a requirement that inmates know their exact dosages before being prescribed medication, but it is not clear that this change in policy will solve the problem. Plaintiffs report that delays have occurred even when the new inmate has arrived with medication from another correctional institution, and that some inmates are waiting in the intake area for as long as 20 hours before an intake nurse even takes their medical history.

mentally ill persons indicates that mental health discharge planning is either not happening or not working." Response at 9.

Accordingly, the Court ORDERS defendants to immediately develop and implement a plan to expand the current discharge planning resources at the jail and to evaluate obstacles to discharge planning and take steps to remove these obstacles.

## VII. *Medical Diets*

A registered dietician employed by the County or its food contractor shall work closely with medical and security personnel to ensure that HIV-positive inmates receive appropriate diets, as indicated on the inmates' treatment plans. The dietician shall be responsible for menu planning and monitoring of both general and medically prescribed diets.

Final Settlement Agreement ¶ III.B.ii.

In his October 30 Report, Dr. Greifinger found this area "worse than ever." Report at 6. In his latest Report, Dr. Greifinger states that there is a new dietician, and that grievances regarding medical diets have been reduced. Nevertheless, it is clear that full compliance with this requirement has not yet been achieved.

Accordingly, the Court ORDERS defendants to evaluate the performance of the food vendor as well as the system for delivering food to inmates and to take whatever steps are necessary to ensure delivery of appropriate medical diets to all inmates for whom such diets have been prescribed.

## VIII. *Quality Management*

Defendants shall perform ongoing quality management that monitors the quality of healthcare services provided at the Jail. The quality management program shall monitor all aspects of healthcare including at least the following: access to healthcare, medication management, nursing ser-

vices, physician services, access to specialty care, mental health services, pharmacy services, dental services, environmental services, infection control procedures, healthcare records, sick call services, intake screening and evaluations, chronic disease services, infirmary care, diagnostic services, discharge planning, and adverse patient occurrences including all deaths. The quality management program shall include reviews of all aspects of healthcare provision at the Jail, and shall identify any deficiencies in services to inmates as well as any staff training needs and/or deficiencies. Corrective plans to address all deficiencies and recommended improvements shall be prepared, and the quality management program shall include ongoing assessment of the effectiveness of corrective plans and actions.

Final Settlement Agreement ¶ VII.A.

In his October Report, Dr. Greifinger stated that "[t]he quality management program is evolving, but nowhere near complete." Report at 5. In his latest report, Dr. Greifinger found that there had been a "hiatus" in the quality management program, and that the medical vendor "had not been paying sufficient attention to this critical area." Report at 5. As plaintiffs point out, it is essential that a fully operational quality management program be in place so that improvements made in the past can be and will be sustained. Likewise, in his latest Report, Dr. Greifinger states: "I cannot emphasize more strongly that good management cannot succeed without good measurement." Report at 5.

Accordingly, the Court ORDERS defendants to immediately take all necessary steps to address deficiencies in their quality management program.

## IX. *Environmental Health and Sanitation*

All housing units to which HIV-positive inmates are assigned shall be adequate to

meet the needs of the HIV-positive inmates placed there. This shall include, but is not limited to, assurance that no HIV-positive inmate in a chronic care unit or with a diagnosis of AIDS shall sleep on the floor, and that all HIV-positive inmates shall have adequate access to toilet facilities, clean bedding and clothing, hot and cold running water, and drinkable water at all times.

Final Settlement Agreement ¶ V.B.

Despite recent renovations, the condition of the plumbing and HVAC systems at the jail continues to deteriorate. According to Dr. Greifinger's latest report: "The benefit from the renovation is gone. Sinks are inoperable again, showers are not functioning well and water fountains often do not work. The plumbing system is either poorly designed or maintained. It should be changed." Report at 5–6. Dr. Greifinger notes that during the coldest week of the winter, a boiler broke down, causing temperatures in many housing areas to drop into the low 60s. A backup boiler, which should have prevented this problem, has not worked in years. Report at 2. As another example, during his latest tour of the jail, Dr. Greifinger observed that there was no cold water in the showers in one of the living areas, so that inmates were unable to take showers. *Id.* In conclusion, Dr. Greifinger states: "Although renovated, the plumbing and air handling systems are virtually collapsed. The County needs to correct these deficiencies in short order." *Id.* at 6.

Accordingly, the Court ORDERS defendants to immediately develop and implement a plan to repair or replace existing plumbing and HVAC systems so that they are able to function under the current population load without constantly breaking down. If the jail cannot be renovated to cure these problems, defendants should so advise the Court so that construction of a new jail can be considered.[9]

## X. *Conclusion*

It is now more than two years since the parties entered into the Final Settlement Agreement. Yet defendants still remain "far from compliance" in many key areas. The Court is totally out of patience with the persistent assurances and promises that compliance will be achieved. Defendants must do what is necessary to comply with their obligations, and they must do it now.

The Court ORDERS defendants to file a report with the Court within thirty (30) days of the date of entry of this order setting out the specific steps they have taken to comply with each of the requirements set out in this order. Plaintiffs shall have 10 days thereafter to file any response. The Court will conduct a hearing on Tuesday, May 28, 2002, beginning at 10:30 a.m. to consider the progress that has been made and to determine what further action may be necessary. Defendants should have appropriate representatives present at the hearing, other than counsel, to address any areas in which full compliance with this order has not been achieved. Finally, the Court DIRECTS defendants' counsel to deliver a copy of this order to each individual defendant, as well as to the chief judges of the State Court and the Magistrate Court of Fulton County.

In summary, the Court ORDERS defendants to immediately implement the remedial actions set out above and to report to the Court within thirty (30) days of the date of entry of this order. A hearing to consider defendants' progress in comply-

---

9. The Court notes that in the past it has ordered the construction of new jails in Cobb, Fayette, and Douglas Counties after the coun-

ty commissioners acknowledged that a new facility was needed.

ing with this order and to determine if further action is needed is scheduled for Tuesday, May 28, 2002, at 10:30 a.m. in Courtroom 1707.