# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

------

Argued April 8, 2008

Decided June 20, 2008

No. 06-7136

JUAN JOHNSON,
APPELLANT

v.

DISTRICT OF COLUMBIA,
APPELLEE

------

CONSOLIDATED WITH 06-7180

------

Appeals from the United States District Court
for the District of Columbia
(No. 02cv01452)

------

*Gregory L. Lattimer* argued the cause and filed the briefs for appellant.

*William J. Earl*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee. With him on the brief were *Linda J. Singer*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Senior Assistant Attorney General. *Edward E. Schwab*, Deputy Attorney General, entered an appearance.

Before: GINSBURG and GRIFFITH, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Juan Johnson is a police officer whose off-duty act of kindness to a stranger in distress landed him in the middle of a drug bust in which he was repeatedly kicked in the groin by a police officer who mistook him for a criminal. Johnson claims he was a victim of police brutality and sues both the officer alleged to have kicked him and the District of Columbia. We consider whether the accused officer is entitled to qualified immunity, and whether a local statute displaces Johnson's common law claims against the District.

## I.

The following version of events, which we accept as true for purposes of this appeal, is based on Johnson's account. On July 23, 2001, Johnson stepped outside his apartment building in southeast Washington, D.C. to check the mail. Except for a police identification badge worn around his neck, Johnson was dressed in civilian clothes that gave no indication he was an officer of the Metropolitan Police Department ("MPD"). As Johnson was walking through the courtyard of his building, a stranger named Andre Clinton approached him and exclaimed that he was being chased by "stick-up boys." Johnson helped Clinton get away from his pursuers by leading him through the locked back door of the apartment building. Once inside, Johnson told Clinton to wait downstairs while he went to his third-floor apartment to get him a glass of water. When Johnson came out of his apartment a moment later, he

was surprised to see Clinton running up the stairs toward him with police officers giving chase.

Clinton was not running from robbers but from the police, and Johnson had unwittingly aided his flight. Moments before, Clinton had sold drugs to an undercover officer and was now attempting to evade arrest. Officers monitoring Clinton's escape mistook Johnson for an armed accomplice and broadcast a police radio report saying so. The officers rushing up the stairs had no idea that Johnson was an off-duty police officer not involved in the crime. To them, he was a potentially dangerous criminal.

Leading the chase was Jeffrey Bruce, an MPD narcotics officer. Bruce and his colleagues entered the apartment building through the unlocked front door, charged up the stairs with guns drawn, and ordered Johnson and Clinton to put up their hands. Johnson, who was standing just outside his apartment, immediately complied and tried to signal to Bruce that he was a fellow police officer. When his signals failed, Johnson realized that he could not easily resolve this case of mistaken identity and feared that Bruce might shoot him in the face or chest. With his hands still raised, Johnson turned away from the gun and fell through the open doorway of his apartment, landing face-down on the floor. While Johnson was prone on the floor with his arms and legs spread, Bruce repeatedly kicked and stomped his groin and buttocks. Johnson protested, "What are you kicking me for? I'm the police. I'm the police. Why are you kicking me, why are you stomping me?" When the MPD identification badge around Johnson's neck finally came into view, Bruce stopped kicking him.

The next day, Johnson visited the Police and Fire Clinic complaining that Bruce's kicking had caused him to pass

blood in his urine. Johnson was placed on "Performance of Duty" ("POD") paid leave for his physical injuries under the Police and Firefighters Retirement and Disability Act, D.C. CODE § 5-701 *et seq.*, from July 24, 2001 until the middle of August of that year.[1] Johnson briefly returned to work but went back on paid leave when his psychological injuries from the kicking were also classified as POD. Johnson remained on paid leave until December 28, 2004, when MPD reclassified his psychological injuries as non-POD. He has since resumed working as an MPD officer.

Johnson filed two complaints in the United States District Court for the District of Columbia, which were consolidated on July 20, 2005. In his complaint dated July 22, 2002, Johnson sued the District of Columbia for police brutality, assault and battery, and intentional infliction of emotional distress (collectively, the "common law claims"). In his complaint dated June 8, 2004, Johnson sued Bruce in his individual capacity under 42 U.S.C. § 1983, alleging a violation of his federal constitutional rights by use of excessive force resulting in an unreasonable seizure under the Fourth Amendment ("§ 1983 claim").[2] The district court had federal-question jurisdiction over Johnson's § 1983 claim, 28 U.S.C. § 1331, and supplemental jurisdiction over his common law claims, *id.* § 1367.

In the course of discovery, Johnson and Bruce gave conflicting accounts of what happened. Bruce testified at his deposition that Johnson tried to escape by lunging into the

---

[1] The parties agree that even though he was off-duty at the time of the incident, Johnson was eligible for POD leave because an officer is "always on duty, although periodically relieved from the routine performance of it." D.C. MUN. REGS. tit. 6A, § 200.4.

[2] Johnson raised additional claims in his complaints, but we discuss only those before us on appeal.

apartment and trying to crawl away, keeping his hands close to his body. Bruce claimed he then ran into the apartment after Johnson, holstered his weapon, and reached for Johnson's arms, at which point Johnson produced his police badge and Bruce let him go. Bruce denied ever having kicked or stomped Johnson.

Bruce and the District moved for summary judgment, which the district court granted as to all claims in a memorandum opinion and order of August 10, 2006. Johnson appeals. We have jurisdiction under 28 U.S.C. § 1291. We review the grant of summary judgment de novo. *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

## II.

Johnson sued Bruce under § 1983 for seizing him with excessive force in violation of the Fourth Amendment.[3] *See* U.S. CONST. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated . . . ."). Such a claim is "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard," *Graham v. Connor*, 490 U.S. 386, 388 (1989), which tracks the constitutional text by asking "whether the force applied was reasonable," *Wardlaw v. Pickett*, 1 F.3d 1297, 1303 (D.C. Cir. 1993). Bruce responds that he is entitled to qualified immunity, a defense we evaluate under

---

[3] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

the two-step analysis set forth in *Saucier v. Katz*, 533 U.S. 194, 200–02 (2001). Under *Saucier*, we ask first whether the officer's alleged conduct violated a constitutional right, the same question we ask to test the merits of Johnson's § 1983 claim. If the facts alleged do not establish a constitutional violation, we end the inquiry and rule for the officer. *Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (Roberts, J.). If the facts alleged do establish that a constitutional right was violated, we go on to ask whether that right was "clearly established." *Saucier*, 533 U.S. at 201.

The district court entered summary judgment against Johnson on his § 1983 claim after concluding that Bruce enjoyed qualified immunity. In the district court's analysis, the seizure was objectively reasonable or, at worst, derogative of rights not yet "clearly established." We will affirm a grant of summary judgment only if we are persuaded that "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). We look to the law that governs the claims asserted and the defenses interposed to determine which of the disputed facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We must view the alleged material facts in the light most favorable to the party resisting summary judgment, *Saucier*, 533 U.S. at 201; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970), and we cannot make credibility determinations or weigh the evidence, *Liberty Lobby*, 477 U.S. at 249, 255.

Applying this standard, we reverse the judgment of the district court. Bruce was not entitled to qualified immunity against Johnson's § 1983 claim at the summary judgment stage because their conflicting deposition testimony gives rise to genuine issues of fact material to both the § 1983 claim and

the qualified immunity defense. We look to *Saucier* to determine the materiality of these factual issues.

## A.

The first *Saucier* question asks, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" 533 U.S. at 201. As noted above, we apply a standard of objective reasonableness to determine the constitutionality of Bruce's alleged kicking under the Fourth Amendment. *Graham*, 490 U.S. at 396. To assess the reasonableness of a seizure, "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place*, 462 U.S. 696, 703 (1983). In so doing, we must give "careful attention to the facts and circumstances of [the] particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. As Judge Friendly famously wrote, "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973). Although Judge Friendly was writing about the Due Process Clause, his reminder carries equal force in the Fourth Amendment context. *Graham*, 490 U.S. at 396 (quoting Judge Friendly's *Johnson v. Glick* opinion in a Fourth Amendment excessive force case). We follow Judge Friendly's lead in inquiring after "such factors as the need for the application of force, the relationship between the need and the amount of force that was used, [and] the extent of injury inflicted." *Johnson v. Glick*, 481 F.2d at 1033.

And so now we must, in Justice Scalia's words, "slosh our way through the factbound morass of 'reasonableness.' " *Scott v. Harris*, 127 S. Ct. 1769, 1778 (2007). Based on the police radio broadcast describing how Clinton and Johnson ran away from the police and into the apartment building, Bruce had reason to fear that Johnson was an armed accomplice to a fleeing drug dealer. Bruce gave chase, eventually cornering Clinton and Johnson on the third-floor landing of the apartment building. With gun drawn, Bruce ordered the suspects to put up their hands. Both complied. Johnson alleges that he raised his hands, turned toward the open door of his apartment, fell face-first to the floor, and spread his arms and legs in a manner announcing submission. Accepting Johnson's allegation that he meant to surrender peacefully, we may assume for the purpose of deciding this appeal that Johnson acted in a submissive fashion. Such was the rapidly developing situation Bruce allegedly encountered: a potentially armed suspect surrenders to an officer who is pointing a gun at him, falls to the floor, and lies there on his belly with arms and legs spread.

In this scenario, we are convinced that a reasonable officer would not have repeatedly kicked the surrendering suspect in the groin. We arrive at this conclusion by balancing the intrusion on Johnson's Fourth Amendment interests against the governmental interests served by Bruce's use of force. *See Graham*, 490 U.S. at 396 (citing *Place*, 462 U.S. at 703). We consider first the severity of the intrusion on Johnson's "right . . . to be secure in [his] person[]." U.S. CONST. amend. IV. Striking the groin is the classic example of fighting dirty. From the schoolyard scrapper to the champion prizefighter, no pugilist takes lightly the threat of a hit below the belt. What's more, Bruce supposedly kicked a man while he was down, hard enough to produce bloody

urine. Although the constable surely has authority to use physical force in effecting an arrest, there are gradations of appropriate violence. *See Tennessee v. Garner*, 471 U.S. 1, 7–12 (1985) (holding deadly force to be a disproportionate and unreasonable means of seizing a fleeing, non-dangerous felon); *Arrington v. United States*, 473 F.3d 329, 331–33 (D.C. Cir. 2006) (holding, in a case where suspect was punched, beaten with a baton, pistol-whipped, and attacked by a police dog, that such violence was "more force than was reasonably necessary" if the suspect had already been disarmed and handcuffed). A kick to the groin tends toward the vicious end of that scale. We have no trouble finding that Bruce's repeated kicks to Johnson's groin were a serious intrusion on his Fourth Amendment interests.

Next, we consider the countervailing governmental interests. An officer in Bruce's position has a legitimate and substantial interest in apprehending an armed suspect and protecting himself and the public from possible harm. Although these are weighty interests, it is not clear how kicking Johnson in the groin furthered either of them. The question is whether the specific police behavior at issue — here, repeatedly kicking a surrendering suspect in the groin — produces some law enforcement benefit that might outweigh the serious harm it causes. *See Delaware v. Prouse*, 440 U.S. 648, 659 (1979) ("The question remains, however, whether in the service of these important ends the [method of seizure] is a sufficiently productive mechanism to justify the intrusion upon Fourth Amendment interests which such [seizures] entail."). At oral argument, counsel could not attest to the usefulness of kicking Johnson in the groin. Neither can we. This tips the balance toward illegality. Bruce's alleged kick to the groin of a prone man, which caused great personal harm to Johnson without any corresponding public benefit, violated the Fourth Amendment.

**B.**

"[I]f a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the [constitutional] right was clearly established." *Saucier*, 533 U.S. at 201. An officer is "shielded from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). We decide de novo whether Johnson's Fourth Amendment right to be free from Bruce's kicks to his groin was clearly established. *Elder v. Holloway*, 510 U.S. 510, 516 (1994).

We begin by establishing the appropriate level of generality at which to analyze the right at issue. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 615 (1999); *Anderson v. Creighton*, 483 U.S. 635, 639–40 (1987). It will not do to ask whether Johnson had a right to be secure in his person against unreasonable seizures. Instead, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. On the facts as we have them on appeal, the issue is whether a reasonable officer could have believed that kicking Johnson in the groin after he had surrendered and posed neither a risk of flight nor any danger was a lawful means of effecting a seizure under the Fourth Amendment. If Bruce's use of force survives this test of "objective legal reasonableness," *Harlow*, 457 U.S. at 819, then he is entitled to qualified immunity. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that "if officers of reasonable competence could disagree on this issue, immunity should be recognized"); *Scott v. District of Columbia*, 101 F.3d 748, 760

(D.C. Cir. 1996) ("[T]he proper inquiry here is whether the officers' actions were so excessive that no reasonable officer on the scene could have believed that they were lawful.").

Coming as it does on the heels of our determination that the alleged kicking was unreasonable, our inquiry into *legal* reasonableness may seem redundant. *Cf. Saucier*, 533 U.S. at 209–17 (Ginsburg, J., concurring in the judgment) (criticizing "the duplication inherent in [*Saucier*'s] two-step scheme"). Despite the similarity of phrasing, the two *Saucier* reasonableness questions are distinct though overlapping. Accordingly, Part II.A of this opinion asks whether it was reasonable for Bruce to kick Johnson's groin, while Part II.B asks whether it was reasonable for Bruce not to know that it was unlawful to kick Johnson's groin. *Saucier*, 533 U.S. at 203–07 (majority opinion); *see also* RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 1129–30 & n.10 (5th ed. 2003) [hereinafter HART & WECHSLER] (explaining the distinction between the "reasonableness" inquiries).

In determining whether officers strayed beyond clearly established bounds of lawfulness, we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view. *Wilson*, 526 U.S. at 617. We need not identify cases with "materially similar" facts, but have only to show that "the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] . . . was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). Bruce is not entitled to qualified immunity if the cases show that his kicking violated the Fourth Amendment, because "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 819.

12

Our review of the cases convinces us that Bruce's alleged use of excessive force violated a clearly established rule: An officer's act of violence violates the Fourth Amendment's prohibition against unreasonable seizures if it furthers no governmental interest, such as apprehending a suspect or protecting an officer or the public. The cases show that officers will not prevail if their use of force cannot be justified under the circumstances. In *Tennessee v. Garner*, the Supreme Court held that the Fourth Amendment prohibits the use of deadly force to seize a non-dangerous fleeing felon, noting that such force is not "a sufficiently productive means of accomplishing" law enforcement goals. 471 U.S. at 10. In *DeGraff v. District of Columbia*, we reversed a summary judgment grant for the police because it was unclear what legitimate interest could have been served by carrying a suspect horizontally through the air and handcuffing her to a mailbox. 120 F.3d 298, 302 (D.C. Cir. 1997).

Even in cases where officers have prevailed, we have emphasized that the violence complained of was undertaken in pursuit of a legitimate end. In *Scott v. District of Columbia*, we found no Fourth Amendment violation where officers struck a suspect once and pinned him to the ground, because "[a]ll of the officers' actions were reasonably calculated toward the goal of securing [the suspect] and placing him in handcuffs, while minimizing his opportunity to escape. Nothing in the record indicates that they used more force than reasonably appeared necessary to achieve that goal." 101 F.3d 748, 760 (D.C. Cir. 1996). In *Wardlaw v. Pickett*, we ruled in favor of a U.S. Marshal who punched a suspect in the face and chest, because the Marshal had reason to fear an attack by the suspect and stopped punching "[o]nce [the suspect] sat down on the stairs and it became apparent that he was not going to attack." 1 F.3d at 1304. In *Martin v. Malhoyt*, we ruled in favor of an officer who forced a driver to remain in

the driver's seat and then closed the car door on the driver's leg, because we concluded that this rough treatment protected the driver from oncoming traffic. 830 F.2d 237, 262 (D.C. Cir. 1987) (R.B. Ginsburg, J.).

The cases add up to the sensible proposition that a police officer must have some justification for the quantum of force he uses. This is not to say that the judicial role in determining what is "unreasonable" under the Fourth Amendment transforms every judge into a police chief. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, and we will "accord[] a measure of respect to the officer's judgment about the quantum of force called for in a quickly developing situation," *Martin*, 830 F.2d at 261. But as the cases clearly establish, the state may not perpetrate violence for its own sake. Force without reason is unreasonable.[4]

---

[4] That officers ought not to use more force than reasonably necessary to advance a governmental interest was also evident from local statutes and regulations. *See* D.C. CODE § 5-123.02 ("Any officer who uses unnecessary and wanton severity in arresting or imprisoning any person shall be deemed guilty of assault and battery, and, upon conviction, punished therefor."); D.C. MUN. REGS. tit. 6A, § 207.1 ("It is the policy of the Metropolitan Police Department that each member of the department shall in all cases use only the minimum amount of force which is consistent with the accomplishment of his or her mission . . . ."). While these materials support our conclusion that Bruce's use of force violated clearly established law, we will not rely on them in light of conflicting Supreme Court decisions concerning the use of state law to determine what is clearly established law. *See* HART & WECHSLER, *supra*, at 1131 n.11 (noting conflict). *Compare Davis v. Scherer*, 468 U.S. 183, 195–96 (1984) (rejecting suggestion that state regulation demarcated clearly established law), *with Hope*, 536 U.S.

\* \* \*

The district court erred in concluding that Bruce was entitled to qualified immunity. Summary judgment was premature because there exists a genuine issue of material fact, namely, whether Johnson's prone position was threatening or suggested escape. That dispute can only be resolved by evaluating the conflicting testimony of Johnson and Bruce. *See Saucier*, 533 U.S. at 209–17 (Ginsburg, J., concurring in the judgment) ("Of course, if an excessive force claim turns on which of two conflicting stories best captures what happened on the street, *Graham* will not permit summary judgment in favor of the defendant official."); *cf.* Patricia M. Wald, *Summary Judgment at Sixty*, 76 TEX. L. REV. 1897, 1907 n.57 (1998) (noting "the example that Professor Arthur Miller is reported to have used regularly in his 1-L Harvard Law School civil procedure class of an earlier time, that if a dozen Jesuit priests proffer identical testimony regarding a street fight they all observed, and one disreputable inebriate proffers contrary testimony, summary judgment is inappropriate"). We reverse the district court's judgment as to Johnson's § 1983 claim and remand the case for trial.

Johnson is not home free. His victory on appeal comes from our having viewed the facts most favorably to him. Seen in that light, the facts are egregious. Once the finder of fact has established what really happened during the tense exchange between Bruce and Johnson, it will be possible to judge whether Bruce's conduct was actually unlawful under the Fourth Amendment. If Johnson's behavior was

at 743–44 (treating state regulations as probative of clearly established law). The cases discussed in the text set forth a clear standard. We need look no further.

threatening, then Bruce's use of force may be regarded as a reasonable means of protecting himself against a possible attempt to retrieve a weapon. *See Wardlaw*, 1 F.3d at 1304. If Johnson appeared to flee, then Bruce's use of force as a means of preventing escape may be regarded as reasonable in light of his suspicion that Johnson was an armed felon. *See Garner*, 471 U.S. at 11. These issues await resolution in the trial court.

## III.

Johnson also presses various common law claims against the District of Columbia. The district court granted summary judgment for the District on these claims, concluding that the Police and Firefighters Retirement and Disability Act ("PFRDA") barred Johnson's suit. On this point we affirm.

The PFRDA is the exclusive remedy against the District for police officers injured while performing their duties. *Feirson v. District of Columbia*, 506 F.3d 1063, 1068 (D.C. Cir. 2007) (citing *Lewis v. District of Columbia*, 499 A.2d 911, 915 (D.C. 1985)). This should end the inquiry. Johnson cannot pursue his common law claims against the District because his having been kicked is covered by the PFRDA. But Johnson makes two arguments for why the PFRDA does not apply. We reject them both.

Johnson's first argument proceeds in three steps. The PFRDA is similar to a workers' compensation statute. In thirty-four states, the workers' compensation statute is not the exclusive remedy for intentional torts committed by a co-worker. *See* 6 ARTHUR LARSON, WORKERS' COMPENSATION LAW § 111.03[1], at 111-8 (2002). Therefore, the PFRDA is not the exclusive remedy in this intentional tort case. Johnson's argument breaks down once we look at the

District's statutes. The Workers' Compensation Act of 1979 ("WCA"), D.C. Code § 32-1501 *et seq.*, covers only "*accidental* injury or death arising out of and in the course of employment . . . and . . . injury caused by the *willful act of third persons* directed against an employee because of his employment." *Id.* § 32-1501(12) (emphases added). Thus the statute excludes intentional torts of the employer, but the D.C. Court of Appeals has explained that the WCA does cover injuries intentionally caused by a co-worker: "From the perspective of the employer" such an "injury is still 'accidental' and the employer is liable" under the WCA, but not in tort, "so long as the injury arose out of and occurred in the course of employment." *Grillo v. Nat'l Bank of Wash.*, 540 A.2d 743, 748 (D.C. 1988); *see also Tekle v. Foot Traffic, Inc.*, 699 A.2d 410, 414 (D.C. 1997). Because the PFRDA and the WCA are not identical, we doubt their coverage is. *See Ray v. District of Columbia*, 535 A.2d 868, 870 (D.C. 1987) (noting that the PFRDA covers any injury incurred in the performance of duty); *Mayberry v. Dukes*, 742 A.2d 448, 451 (D.C. 1999) ("[E]ven though the [PFRDA] and the WCA serve similar purposes, we cannot just ignore differences in the statutory language of the two acts."). Even if their coverage were identical, however, in light of *Grillo*, Johnson could not sue the District for the intentional tort of one of its employees. Nor does Johnson's brief allege any intentional wrongdoing by the District. *Cf. Grillo*, 540 A.2d at 748. Consequently Johnson's argument fails surely at the first step, and almost surely at the second.

Johnson's next argument, which is somewhat confusing, tries to make much of a classification decision regarding psychological injuries he claims to have suffered from the kicking. MPD initially ruled these injuries POD and gave him paid leave. But a new Stress Protocol, which defines the sorts of psychological injuries covered under the PFRDA, led MPD

to reclassify the psychological injuries as non-POD. Johnson argues that the incident and the injury are so intertwined that reclassification of his psychological injuries as non-POD somehow removed the kicking altogether from the PFRDA's coverage.

MPD reclassified Johnson's psychological injuries as non-POD under the Stress Protocol because they were not the direct result of a uniquely stressful event — the kicking — but were instead a consequence of stressors inherent to the law enforcement profession. Simply put, the kicking and the psychological injuries are not so intertwined as Johnson argues. Johnson suffered his kicking in the performance of duty and was compensated under the PFRDA for his resulting injuries regardless of whether he was also compensated under the PFRDA for job-related stress. Johnson cannot opt out of the PFRDA regime and head to court just because he is dissatisfied with the level of compensation provided. The PFRDA was Johnson's exclusive source of remedies against the District, and the district court was correct to enter summary judgment against his common law claims.

## IV.

For the reasons stated in this opinion, we reverse the district court's judgment in favor of Bruce and remand for trial of Johnson's § 1983 claim, and affirm the judgment in favor of the District as to Johnson's common law claims.

*So ordered.*