Opinion for the Court filed by Circuit Judge GINSBURG.
Dissenting opinion filed by Circuit Judge ROGERS.
GINSBURG, Circuit Judge:
The named plaintiffs filed this class action suit for damages against Todd Walther Dillard, a former United States Marshal for the Superior Court of the District of Columbia, claiming that, after being arrested during a demonstration in September 2002, they were unconstitutionally strip searched by Deputy U.S. Marshals under Dillard’s direction. According to the plaintiffs, caselaw had by then clearly established that the Fourth Amendment to the Constitution of the United States prohibited strip searching a person arrested for a non-violent, non-drug-related misdemeanor absent a particularized reason to suspect the arrestee was concealing contraband or weapons about his person. Dillard moved for summary judgment based upon qualified immunity, and when the district court denied that motion, brought this interlocutory appeal. We conclude it was not clearly established in 2002 that the strip search of a person being introduced into a detention facility violated the Fourth Amendment. Therefore, Dillard is entitled to qualified immunity and to summary judgment.
I. Background
In 1999 the United States Marshals Service (USMS) adopted Policy Directive No. 99-25 to prescribe, among other things, the procedure for strip searching prisoners and “other persons who are under arrest.” The Policy Directive authorized a “strip search,” defined as “[a] complete search of a prisoner’s attire and a visual inspection of the prisoner’s naked body, including body cavities,” when “there is reasonable suspicion that the prisoner may be (a) carrying contraband and/or weapons, or (b) considered to be a security, escape, and/or suicide risk.” “Reasonable suspicion” was to be determined according to the following criteria:
a. Serious nature of the offense(s) charged, i.e., whether crime of violence or drugs;
b. Prisoner’s appearance or demeanor;
c. Circumstances surrounding the prisoner’s arrest or detention; i.e., whether the prisoner has been convicted or is a pretrial detainee;
d. Prisoner’s criminal history;
e. Type and security level of institution in which the prisoner is detained; or
f. History of discovery of contraband and/or weapons, either on the prisoner individually or in the institution in which prisoners are detained.
Dillard was the United States Marshal for the Superior Court of the District of Columbia when the plaintiffs were arrested and allegedly strip searched. Under his supervision, all male arrestees held at the Superior Court were strip searched upon arrival, before being put into the cellblock; * more specifically, each male arrestee was required to drop his trousers and underwear, bend over or squat, and *383 expose his buttocks and genitals to a male Deputy Marshal. This practice had been instituted in light of an extensive history of prisoners’ concealing contraband on their bodies while in the cellblock. In the four years prior to the plaintiffs’ arrests, the USMS had documented at least 30 incidents in which Deputy Marshals discovered contraband — including drugs, knives, razor blades, and box cutters — on prisoners brought to the Superior Court cell-block by law enforcement.
Metropolitan Police officers arrested the plaintiffs on the morning of September 27, 2002 while they were protesting a meeting of the International Monetary Fund and the World Bank in downtown Washington, D.C. The officers initially transported the protestors to various police holding facilities; later that day, the officers bused the named plaintiffs and others to the Superi- or Court and transferred them to the custody of the USMS. Because the plaintiffs had refused to identify themselves to law enforcement authorities, they were recorded as “John Does” on the “lockup list” provided to the Deputy Marshals.
At the Superior Court, each plaintiff first passed through a metal detector and was then subjected to a pat-down search. The Deputy Marshals then strip searched the arrestees in a receiving cell in batches of approximately ten men; no plaintiff was touched and no female was present during the search. No contraband was recovered from any plaintiff.
After being strip searched, groups of 20 to 30 men were placed together in holding cells to await disposition of the charges against them. Each had been charged with either “incommoding” traffic or “failure to obey” a law enforcement officer, both of which are misdemeanors. On September 28 they were released, some having been fined and others not sentenced at all.
The named plaintiffs filed this class action seeking damages from Dillard pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). They claimed the strip searches, because performed without individualized suspicion, violated their right under the Fourth Amendment to be free from unreasonable searches.
The district court certified a class of plaintiffs consisting of:
All men who were: (1) arrested on September 27, 2002 by the D.C. Police officials during a series of mass protests in downtown Washington, D.C.; (2) remanded by D.C. Police, following their arrests, into the custody of the U.S. Marshall] for the District of Columbia prior to being released; and (3) subjected by deputy U.S. Marshals to a strip, visual, body cavity search without any particularized or individualized reasonable suspicion that he was concealing drugs, weapons or other contraband....
The plaintiffs moved for summary judgment on the issue of liability and Dillard moved for judgment on the pleadings or, in the alternative, for summary judgment, arguing he was entitled to qualified immunity under Saucier v. Katz, 533 U.S. 194, 200-02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).
The district court denied Dillard’s motion. It concluded the strip searches violated the Fourth Amendment and held Dillard was not entitled to qualified immunity “because the law was clearly established that blanket strip searches of non-violent, non-felony arrestees were unlawful” in 2002. Bame v. Dillard, 647 F.Supp.2d 43, 52, 55 (2009). The court also denied the plaintiffs’ motion for summary judgment because Dillard had denied the strip searches occurred, thus creating a genuine issue of material fact. For the purpose of *384 this appeal, however, Dillard concedes the strip searches took place as alleged.
II. Analysis
The only issue on appeal is whether Dillard is entitled to qualified immunity, which issue we resolve de novo. Elder v. Holloway, 510 U.S. 510, 516, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994). Qualified immunity is “a defense that shields officials from suit if their conduct ‘d[id] not violate clearly established statutory or constitutional rights of which a reasonable person would have known.’ ” Ortiz v. Jordan, — U.S. -, 131 S.Ct. 884, 888, 178 L.Ed.2d 703 (2011) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Supreme Court in Saucier established a two-step test for determining whether a government official is entitled to qualified immunity. First, the court asks whether “the facts alleged show the officer’s conduct violated a constitutional right.” 533 U.S. at 201, 121 S.Ct. 2151. If so, then the court must determine “whether the right was clearly established” at the time of the alleged violation. Id. The Supreme Court has since clarified that “the sequence set forth [in Saucier ],” although “often appropriate,” is not mandatory. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009). Courts may “exercise their sound discretion” in deciding which question to address first “in light of the circumstances in the particular case at hand.” Id.
In this case the principle of constitutional avoidance counsels that we turn directly to the second question. As the Court recognized in Pearson itself, “There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” Id. This is such a case.
Therefore the first and, as it happens, only question we address is whether it was clearly established in September 2002 that strip searching an arrestee before placing him in a detention facility without individualized, reasonable suspicion was unconstitutional. To answer this question, “we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view,” Johnson v. District of Columbia, 528 F.3d 969, 976 (D.C.Cir.2008)— if there is one. The facts of such cases need not be “ ‘materially similar’ ... but have only to show that ‘the state of the law [at the time of the incident] gave [the officer] fair warning that [his alleged misconduct] ... was unconstitutional.’ ” Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).
Central to our inquiry in this case, as reflected in the briefs of both parties, is the decision in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). There pretrial detainees and others ** housed in the New York Metropolitan Correctional Center (MCC), a “short-term custodial facility,” challenged the constitutionality of strip searching each inmate who had been visited by an outsider, without regard to individualized suspicion. Id. at 523, 558-60, 99 S.Ct. 1861. The Court noted that, under the Fourth Amendment generally, the reasonableness of a search is to be determined by balancing “the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.” Id. at 559, 99 S.Ct. 1861.
*385 Applying this general “test of reasonableness,” id., the Court in Bell upheld the policy of the MCC because the “legitimate security interests of the institution” in preventing the introduction of contraband into the facility outweighed the inmates’ interest in privacy: “A detention facility is a unique place fraught with serious security dangers,” where the “[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence.” Id. at 559-60, 99 S.Ct. 1861. Consequently, corrections officials are to be “accorded wide-ranging deference” in adopting policies needed “to maintain institutional security.” Id. at 547-48, 99 S.Ct. 1861. In so stating, the Court expressly rejected the plaintiff inmates’ argument that less deference is due to an official holding detainees — as was Dillard in this case — as opposed to convicts. Id. at 547 n. 29, 99 S.Ct. 1861.
Dillard argues Bell establishes the strip searches conducted at the Superior Court were not clearly unconstitutional. For their part, the plaintiffs contend there was by 2002' — -when the searches here occurred — a consensus among the circuits to have considered the issue that Bell required individualized, reasonable suspicion to support the strip search of “persons arrested for non-violent non-drug related misdemeanor offenses.” ***
Dillard responds with the decisions in Powell v. Barrett, 541 F.3d 1298 (11th Cir.2008) (en banc), and Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir.2010) (en banc), which he says created a conflict among the circuits as to the meaning of Bell. In Powell, the Eleventh Circuit upheld the “practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband.” 541 F.3d at 1300. In Bull, the Ninth Circuit similarly concluded the policy of the San Francisco Sheriffs Department of strip searching all arrestees upon introduction into the general jail population did not violate the Fourth Amendment, and therefore reversed the district court’s denial of the sheriffs motion for summary judgment based upon qualified immunity. 595 F.3d at 966.
The plaintiffs argue we should disregard Powell and Bull because they were decided after the strip searches at issue here and were therefore unknown to Dillard at the relevant time. Alternatively, they would have us distinguish these cases because they addressed the rights of persons being booked into a general jail population for “housing them overnight or longer.” The plaintiffs also point to other cases they say gave Dillard “fair warning” that strip searching the plaintiffs was unconstitutional. These include a March 2002 decision of the District Court observing that “[mjost federal courts of appeals” had agreed “that strip searches of individuals arrested for minor offenses violate the Fourth Amendment unless the individual is reasonably suspected of concealing weapons, drugs, or other contraband,” Helton v. United States, 191 F.Supp.2d 179, 184 (D.D.C. 2002), an unpublished Ninth Circuit deci *386 sion, ACT UP!/Portland v. Bagley, No. 93-35592, 1995 WL 375822, at *5 (June 22, 1995), denying qualified immunity to the Deputy Marshals who had strip searched demonstrators who had been arrested, and the Memorandum of Agreement in Morgan v. Barry, Civ. A. No. 81-1419, discussed above at 382 n.*.
We conclude the law in 2002 did not clearly establish that strip searching all male arrestees prior to placement in holding cells at the Superior Court violated the Fourth Amendment. The governing precedent was then, as it is now, Bell v. Wolfish, and nothing in Bell requires individualized, reasonable suspicion before strip searching a person entering a detention facility. To the contrary, as the Eleventh Circuit would later point out, “The Bell decision means that the Fourth Amendment does not require reasonable suspicion for this type of strip search in detention facilities.” Powell, 541 F.3d at 1308.
The dissent places great weight upon a passage in Wilson v. Layne in which the Supreme Court suggested the plaintiffs there could have prevailed by identifying “a consensus of [lower court] cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.” 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). We are aware of no Supreme Court case, however, that suggests a reasonable officer could not have believed his actions were lawful despite a consensus among the courts of appeals when a precedent of the Supreme Court supports the lawfulness of his conduct.
A different reading of Bell by the several circuits to have considered the issue before 2002 could not “clearly establish” the unconstitutionality of strip searches in this context. That Powell and Bull came down after 2002 is of no moment; those opinions simply accord with our own understanding that Bell did not establish the unconstitutionality of a strip search under conditions like those present here† 1 William Blackstone, Commentaries *70-71 (If a “judge may mistake the law,” then “subsequent judges do not pretend to make a new law, but to vindicate the old one from misrepresentation”). Indeed, the Eleventh Circuit expressly considered and rejected the pre-2002 decisions of the circuits requiring reasonable, individualized suspicion before conducting a strip search at a detention facility, Powell, 541 F.3d at 1306-07, and the Ninth Circuit likewise rejected those decisions requiring reasonable, individualized suspicion before strip searching an arrestee entering a general jail population, Bull, 595 F.3d at 980-81. In other words, those courts did not believe the prior decisions upon which the plaintiffs rely had established — much less clearly established — that strip searches of the sort here at issue were unconstitutional. Why, then, should Marshal Dillard have believed that?
Clearly, it was reasonable for Dillard, like the courts of appeal that reached the issue after 2002, to believe strip searching all male arrestees was consistent with the law as set forth in Bell and as implemented by the USMS in Policy Directive No. *387 99-25. The correctional center in Bell, like the Superior Court eellblock, was used primarily to house not convicts but persons awaiting their appearance in court. 441 U.S. at 524, 99 S.Ct. 1861. The dissent makes much of the distinction between “pretrial detainees” and “pre-arraigned arrestees” in its attempt to distinguish this case from Bell. As the court in Powell observed, however, “The policy that the Court categorically upheld in Bell applied to all inmates, including those charged with lesser offenses and even those charged with no wrongdoing at all who were being held as witnesses in protective custody.” 541 F.3d at 1307. Thus, the purported distinction “finds no basis in the Bell decision, in the reasoning of that decision, or in the real world of detention facilities.” Id. at 1310. Because many arrestees, including “[d]emonstrators or protestors engaged in civil disobedience, ... have all the time they need to plan their arrests and conceal items on their persons,” id. at 1313-14, we have no reason to believe arrested demonstrators are any less a threat to security than are pretrial detainees.
Furthermore, the Court’s rationale in Bell applies equally to any detention facility that is “fraught with serious security dangers,” id. at 559, 99 S.Ct. 1861, as was the eellblock at the Superior Court, where often hundreds of arrestees were processed in a single day. Contrary to the plaintiffs’ contention, nothing whatsoever in Bell suggests its holding is limited to overnight detention facilities. Cf. Powell, 541 F.3d at 1310 (“The need for strip searches at all detention facilities ... is not exaggerated”) (emphasis added). Nor — despite the emphasis our dissenting colleague places upon “intermingling” with other arrestees or detainees — did the Court in Bell anywhere mention, let alone rely upon, such intermingling as a reason for upholding the strip searches. In any event, arrestees held at the Superior Court were in fact commingled with other arrestees in holding cells; no one suggests each arrestee was put in a separate cell.
Moreover, the Court in Bell upheld strip searches even though “there ha[d] been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person.” 441 U.S. at 559, 99 S.Ct. 1861. As the Court speculated, the dearth of incidents may be a “testament to the effectiveness of this search technique as a deterrent.” Id. Be that as it may, the record here substantiates Dillard’s point that the Superior Court had a persistent problem with contraband being smuggled into the eellblock, the very reason for strip searches contemplated in subsection (f) of Policy Directive No. 99-25. Furthermore, the strip searches at the Superior Court were no more intrusive than those upheld as reasonable in Bell, where a male was required to “lift his genitals and bend over to spread his buttocks for visual inspection.” 441 U.S. at 558 n. 39, 99 S.Ct. 1861.
Contrary to our dissenting colleague’s assertion, decisions of the courts of appeals reached after the events here in suit are relevant to the issue of qualified immunity. In determining whether an official is entitled to qualified immunity, courts focus upon the state of the law “at the time [the] action occurred” because “i[f] the law at that time was not clearly established,” then the official “could not reasonably be expected to anticipate subsequent legal developments.” Harlow, 457 U.S. at 818, 102 S.Ct. 2727. The point is not, as the dissent would have it, to deny an official the benefit of subsequent cases reflecting the uncertain state of the law at the time of his action. As the Supreme Court in Pearson said of its earlier decision in Wilson v. Layne, there “a Circuit split on the relevant issue had developed after the events that gave rise to suit”; the *388 Court nonetheless “concluded that ‘[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.’ ” Pearson, 129 S.Ct. at 823 (quoting 526 U.S. at 618, 119 S.Ct. 1692). So, too, here would it be unfair to subject Dillard to money damages for having relied upon the Supreme Court’s decision in Bell.
III. Conclusion
Because there was in 2002 no clearly established constitutional prohibition of strip searching arrestees without individualized, reasonable suspicion, we need not consider whether Dillard had individual suspicion as to each of the plaintiffs. The order of the district court is reversed and the case is remanded for that court to enter summary judgment for the defendant.

So ordered.

 Dillard denies this procedure was "followed in practice," although he concedes for purposes of the appeal that the strip searches occurred in this case. In settlement of Morgan v. Barry, Civ. A. No. 81-1419 (D.D.C.1981), the District of Columbia had signed a Memorandum of Agreement not to strip search female arrestees prior to arraignment without individualized, reasonable suspicion or unless the arrestee was to come into contact with the general inmate population of the detention facility. The practice of strip searching all male arrestees is no longer in place at the Superior Court.

 The MCC also housed some convicted inmates, “witnesses in protective custody, and persons incarcerated for contempt.” Bell, 441 U.S. at 524, 99 S.Ct 1861. All were subject to the same policy of strip searching.

The plaintiffs cite Wilson v. Jones, 251 F.3d 1340 (11th Cir.2001), which was overruled by Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc); Roberts v. Rhode Island, 239 F.3d 107 (1st Cir.2001); Masters v. Crouch, 872 F.2d 1248 (6th Cir.1989); Weber v. Dell, 804 F.2d 796 (2d Cir. 1986); Jones v. Edwards, 770 F.2d 739 (8th Cir.1985); Stewart v. Lubbock County, 767 F.2d 153 (5th Cir.1985); Giles v. Ackerman, 746 F.2d 614 (9th Cir. 1984), which was overruled by Bull v. City and County of San Francisco, 595 F.3d 964 (9th Cir.2010) (en banc); Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir.1983); and Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981).

 Since oral argument in this case, the Third Circuit has joined the Eleventh and the Ninth Circuits in upholding the constitutionality of strip searching all arrestees upon their introduction into a general jail population. Florence v. Bd. of Chosen Freeholders, 621 F.3d 296 (3d Cir.2010); but see Jimenez v. Wood Cnty., 621 F.3d 372, 375-76 (5th Cir.2010) (following circuit precedent in holding reasonable suspicion is required to strip search -an individual arrested for a minor offense); Stearns v. Clarkson, 615 F.3d 1278, 1282 (10th Cir.2010) (circuit precedent clearly established "a detainee who is not placed in the general prison population cannot be strip searched” without reasonable suspicion) (internal quotation marks and citation omitted).