[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16734

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 4, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-01100-CV-RWS-1

C. ALAN POWELL, individually, and on behalf of
all others similarly situated,
TORY DUNLAP, individually, and on behalf of
all other similarly situated,
LEE ANTONIO SMITH, individually, and on behalf
of all other similarly situated,
DAVID EVANS, individually, and on behalf of
all others similarly situated,

Plaintiffs Appellees
Cross-Appellants,

versus

SHERIFF JACQUELINE BARRETT,
Fulton County, State of Georgia,
SHERIFF MYRON FREEMAN,
FULTON COUNTY, STATE OF GEORGIA,
CHAIRPERSON KAREN HANDEL,
Fulton County Board of Commissioners,
MEMBER ROBB PITTS,
Fulton County Board of Commissioners,
MEMBER TOM LOWE,
Fulton County Board of Commissioners,
MEMBER EMMA I. DARNELL,
Fulton County Board of Commissioners,

MEMBER NANCY A. BOXILL,
Fulton County Board of Commissioners,
MEMBER WILLIAM EDWARDS, a.k.a. BILL EDWARDS,
Fulton County Board of Commissioners,
CITY OF ATLANTA, State of Georgia,

Defendants-Appellants
Cross-Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(September 4, 2008)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH, DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and PRYOR, Circuit Judges.

CARNES, Circuit Judge:

We granted rehearing en banc to decide whether a policy or practice of strip searching all arrestees as part of the process of booking them into the general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband, is constitutionally permissible. We answer that question in the affirmative, at least where the strip search is no more intrusive than the one the Supreme Court upheld in Bell v. Wolfish, 441 U.S. 520, 99 S. Ct. 1861 (1979).

2

# I.

The facts and procedural history of this entire case are set out in accurate detail in the panel opinion. Powell v. Barrett, 496 F.3d 1288 (11th Cir. 2007), vacated, No. 05-16734 (11th Cir. Feb. 1, 2008). As it explains, the named plaintiffs in this class action lawsuit are eleven former detainees at the Fulton County Jail in Georgia, all of whom were strip searched upon entering or re-entering the general population at that detention facility. Id. at 1296, 1298. The eleven named plaintiffs can be divided into three groups, which overlap to some extent. Id. at 1297. One of those three groups is "the Arrestee Strip Search Class (AR Group)," which consists of the eight plaintiffs who were strip searched as part of the point-of-entry booking process before they were placed into the general jail population for the first time. Id. at 1297–98. Three of the eight members of that group were arrested on charges that supplied reasonable suspicion to believe that they might be concealing contraband at the time they were booked into the jail. Id. at 1312.

Our en banc interest, as reflected in our briefing instructions, is in the strip searches conducted on the other five members of the arrestee group (plaintiffs Powell, Clemons, Middleton, Witherspoon and Wolf). Id. As to each of those five, neither the charge itself nor any other circumstance supplied reasonable

3

suspicion to believe that the arrestee might be concealing contraband. See id. at 1312–13. The five were strip searched solely because they were entering the general population of inmates at the detention facility.

Because this is an appeal from the denial of a motion to dismiss, we take the facts from the allegations of the complaint. Pielage v. McConnell, 516 F.3d 1282, 1284 (11th Cir. 2008); Locke v. SunTrust Bank, 484 F.3d 1343, 1345 n.1 (11th Cir. 2007); Spain v. Brown & Williamson Tobacco Corp., 363 F.3d 1183, 1186 (11th Cir. 2004). The allegations are that four of these five plaintiffs were taken to the Fulton County Jail for detention after being arrested on relatively minor charges: a bail revocation on a disorderly conduct charge, a traffic ticket warrant, a DUI charge, and a contempt charge for failure to pay child support. Powell, 496 F.3d at 1312; (R6:78:¶89.) The fifth plaintiff in this group was arrested on a burglary charge, which we (like the panel) assume did not involve an element of violence. Powell, 496 F.3d at 1312 & n.32.

"Every person booked into the Fulton County Jail general population is subjected to a strip search conducted without an individual determination of reasonable suspicion to justify the search, and regardless of the crime with which the person is charged." (R6:78:¶180.) The booking process includes "having the arrested person go into a large room with a group of up to thirty to forty other

4

inmates, remove all of his clothing, and place the clothing in boxes." (Id. ¶181.) The entire group of arrestees then takes a shower in a single large room. (Id. ¶¶182, 238.) After the group shower each arrestee "either singly, or standing in a line with others, is visually inspected front and back by deputies." (Id. ¶183.) "Then each man [takes] his clothes to a counter and exchange[s] his own clothes for a jail jumpsuit." (Id. ¶ 239.) Identifying an illustrative case, the complaint alleges that one of these five plaintiffs "along with every other inmate in the process, had to stand before a guard front and center, and show his front and back sides while naked." (Id. ¶240.) There is no allegation that any members of the opposite sex either conducted the visual searches or were present while they were being conducted. Nor is there any allegation that the searches were conducted in an abusive manner. See Powell, 496 F.3d at 1310 n.28 ("We note that, in the instant case, Plaintiffs do not challenge the manner of the strip searches.").

The five plaintiffs contend that the strip searches violated the Fourth Amendment because there was no reasonable suspicion to believe that any of them had hidden contraband. The panel felt forced to agree, citing our prior decision in Wilson v. Jones, 251 F.3d 1340 (11th Cir. 2001), as well as an earlier opinion that had reached the same conclusion, albeit in dicta, Skurstenis v. Jones, 236 F.3d 678, 682 (11th Cir. 2000) (stating that a strip search without reasonable suspicion does

not comport with the Fourth Amendment but that reasonable suspicion existed in that case). Powell, 496 F.3d at 1310, 1312; see also Cuesta v. Sch. Bd., 285 F.3d 962, 969 (11th Cir. 2002) (noting that "[i]n Wilson, we made the dicta of Skurstenis binding law" but concluding that reasonable suspicion existed in that case). The panel did point out that our decisions imposing a reasonable suspicion requirement for point-of-entry strip searches at detention facilities had "relied on, but misconstrued, the Supreme Court's decision in Bell," and that "[w]e have since recognized our misinterpretation" of that decision. Powell, 496 F.3d at 1312 (citing Evans v. Stephens, 407 F.3d 1272, 1279 (11th Cir. 2005) (en banc) (dicta)).

Despite its misgivings, the panel acted properly in following Wilson because it was bound by the prior panel precedent rule to do so. Smith v. GTE Corp., 236 F.3d 1292, 1301–02 (11th Cir. 2001); Cohen v. Office Depot, Inc., 204 F.3d 1069, 1076 (11th Cir. 2000); United States v. Steele, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (en banc); Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997); Gwin v. Snow, 870 F.2d 616, 623–24 (11th Cir. 1989). We are not. Sitting en banc, we are free to revisit the Wilson decision and its interpretation of Bell and to decide for ourselves what Bell means.

## II.

The reasoning that leads us to uphold the searches of these five plaintiffs is

6

simple. After balancing the privacy interests of detention facility inmates against the important security interests involved, the Supreme Court upheld the visual body cavity strip searches at issue in the Bell case against a Fourth Amendment attack. The security needs that the Court in Bell found to justify strip searching an inmate re-entering the jail population after a contact visit are no greater than those that justify searching an arrestee when he is being booked into the general population for the first time. And the searches conducted in the Bell case were more intrusive, and thereby impinged more on privacy interests, than those conducted in this case. It follows from the Bell decision that the less intrusive searches in this case do not violate the Fourth Amendment. That is the gist of our reasoning, the details of which follow.

## A.

Before getting into those details, we pause briefly to address the defendants' contention that the test we should apply is the one for prison regulations in general that was announced in Turner v. Safley, 482 U.S. 78, 107 S. Ct. 2254 (1987), instead of the more strip search-specific Fourth Amendment analysis that the Supreme Court used in Bell. In their brief, the plaintiffs oppose the defendants' position, arguing instead that we should apply the specific Fourth Amendment approach.

The plaintiffs' position is consistent with the Supreme Court's repeated admonitions that we should not assume that it has, by implication, overruled a prior decision specifically on point with later, more general language in a different decision. Hohn v. United States, 524 U.S. 236, 252–53, 118 S. Ct. 1969, 1978 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality."); Agostini v. Felton, 521 U.S. 203, 237, 117 S. Ct. 1997, 2017 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484, 109 S. Ct. 1917, 1921–22 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). We take those admonitions seriously. See United States v. Greer, 440 F.3d 1267, 1275–76 (11th Cir. 2006); Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade County, 122 F.3d 895, 908 (11th Cir. 1997); Brisentine v. Stone & Webster Eng'g Corp., 117 F.3d 519, 525–26 (11th Cir. 1997); Scala v. City of Winter Park, 116 F.3d 1396, 1399 n.2 (11th Cir. 1997). Until the Supreme Court tells us that the Bell

8

approach no longer applies where that Court applied it, we are inclined to continue using it.

We also concur in the agreement that is implicit in the parties' opposing positions—that to the extent of any difference, the Bell Fourth Amendment test is more detainee friendly in this context than the test in Turner. Because we conclude that the plaintiffs lose even under the straight Fourth Amendment approach of Bell, we need not decide if that approach has been superseded by the more deferential Turner one.

**B.**

The Bell case involved a class action lawsuit brought by pretrial detainees being held at the federal Metropolitan Correctional Center in New York City. Bell, 441 U.S. at 523, 99 S. Ct. at 1866. The MCC had a general strip search policy that applied to all inmates, id. at 530, 99 S. Ct. at 1869, including pretrial detainees, "convicted inmates who [were] awaiting sentencing or transportation to federal prison," "convicted prisoners who [had] been lodged at the facility under writs of habeas corpus . . . issued to ensure their presence at upcoming trials, witnesses in protective custody, and persons incarcerated for contempt," id. at 524, 99 S. Ct. at 1866.

Under the MCC's policy all inmates, regardless of the reason for their

detention, were required "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." Id. at 558, 99 S. Ct. at 1884. More specifically: "If the inmate is a male, he must lift his genitals and bend over to spread his buttocks for visual inspection. The vaginal and anal cavities of female inmates also are visually inspected." Id. at 558 n.39, 99 S. Ct. at 1884 n.39.

The pretrial detainees alleged in their complaint in Bell that the MCC's strip search policy violated their Fourth Amendment right to be free from unreasonable searches. Id. at 526–27 & n.7, 99 S. Ct. at 1868 & n.7. The district court emphatically agreed. United States ex rel. Wolfish v. Levi, 439 F. Supp. 114, 146–48 (S.D.N.Y. 1977). In an overwrought passage crackling with indignation, the court described the postures that the inmates were forced to assume during the visual body cavity searches as "calculated to trigger, in the officer and inmate respectively, feelings of sadism, terror, and incipient masochism that no one alive could have failed to predict." Id. at 147. The court found that on some occasions "male correction officers have been incited by the temptation to indulge the sense of a cheap machismo" and had made "insultingly suggestive remarks and banal but terrifying expressions of aggression" to those being searched. Id. It was, the court insisted, a "grisly procedure" and a "loathesome practice." Id. The court credited

10

the testimony of some inmates who said that they had found the visual body cavity searches "so high a price as to forego [contact] visits or to feel after a visit that it was not worthwhile." Id.

Not only that, but the district court in Bell also found that visually inspecting the body cavities of inmates after each contact visit had turned up barely any contraband. Id. That was not surprising, the court reasoned, given that "inmates and their visitors are in full view during the visits and fully clad," so that "[t]he secreting of objects in rectal or genital areas becomes in this situation an imposing challenge to nerves and agility." Id. In all of the time that the searches had been conducted there had been only one occasion when any object—it was a red balloon containing heroin—had been spotted in an inmate's vagina. Wolfish v. Levi, 573 F.2d 118, 131 (2d Cir. 1978) ("[I]n this case appellants proved only one instance in the MCC's several years of existence when contraband was found during a body cavity inspection."); Wolfish, 439 F. Supp. at 147. The visual inspections of anuses had never turned up any contraband, a fact that did not surprise the court for physiological reasons it felt compelled to explain. Wolfish, 439 F. Supp. at 147.

Even though it recognized that "the prospect of the strip search may serve as a deterrent to people planning to secrete and import forbidden things," the district court believed that deterrence "cannot justify the more extreme and offensive

11

aspects of the strip search." Id.  It advised the warden of MCC and the Director of the Bureau of Prisons that they should be most concerned about weapons, which "are discoverable by metal detecting devices and, if necessary, other equipment employed for airline security and other purposes." Id.  As for "other things, mainly narcotics, that might still be secreted and evade detection," the court could not say "with confidence" how serious that problem may be.  Id.  It could say with confidence, though, that "the goal of absolute security is unattainable, and we must assume that some contraband will continue to make its way into jails and prisons, as it always has—whether through visitors, guards, lawyers, clergymen, or otherwise." Id. at 148.

That said, the district court in Bell insisted that it was not treating the security needs of the detention facility lightly and would let the officials who ran it "go as far as may be permitted by the demands of reasonableness in the Fourth Amendment and the claims of decency in the Fifth." Id.  The court ordered the detention officials to "cease the routine requirements of anal and genital inspections after visits." Id.  They could perform those inspections only "upon a specific and particular demonstration of probable cause for doing so." Id.

However, the district court in Bell did not curtail all routine strip searches. To the contrary, the court justified its restriction on anal and genital inspections by

12

stating that: "[T]he demands of security are amply satisfied if inmates are required to disrobe, to have their clothing subjected to inspection, and to present open hands and arms to demonstrate the absence of concealed objects." Id. The court allowed those full body visual strip searches, which did not require the inmates to take any action to more fully expose their anal or genital areas to inspection, to continue without any showing of cause. Id.; see also Bell, 441 U.S. at 558, 99 S. Ct. at 1884 ("The District Court upheld the strip-search procedure but prohibited the body-cavity searches, absent probable cause to believe that the inmate is concealing contraband."); Wolfish, 573 F.2d at 131 (stating that the district court judge "left the basic strip-search procedures undisturbed, but . . . [h]e prohibited inspection of the genitals and anus unless there is probable cause to believe that the inmate is concealing contraband"). The district court left the basic strip search procedure in place only "with grave reluctance, inviting reconsideration by wiser judges or [the detention officials] themselves in the more mature wisdom of future times." Wolfish, 439 F. Supp. at 148.

Three decades have passed but the Bureau of Prisons, which administers MCC, still has not reached the state of "more mature wisdom" that the district court in Bell hoped that it would. A materially identical strip search policy is still in effect at all federal detention facilities. See infra at 23–24. There was

13

"reconsideration by wiser judges" of the district court's decision, but ultimately it did not come out the way that court had hoped.

On appeal, the Second Circuit agreed with the district court's conclusions about the strip searches. Wolfish, 573 F.2d at 131. Its reasoning about the body cavity inspection part of the strip searches is summed up in these two sentences from its opinion: "The gross violation of personal privacy inherent in such a search cannot be outweighed by the government's security interest in maintaining a practice of so little actual utility. To speak plainly, in the circumstances presented by this record, the procedure shocks one's conscience." Id. The Second Circuit's decision nonetheless left the detention officials free to require, even without any individualized cause, full body visual strip searches. Id. What the decision prohibited, absent probable cause, was forcing inmates to assume postures or take other actions that would more fully expose their anal and genital areas to visual inspection. Id. In other words, the court of appeals affirmed the district court's order on strip searches. Id.

The Supreme Court did not. In facing the issue the high court did not attempt to airbrush the facts but instead described in unblinking terms how the visual body cavity searches were conducted. Bell, 441 U.S. at 558 & n.39, 99 S. Ct. at 1884 & n.39. Because the district court had upheld the strip search policy

14

except for the body cavity inspections, it was that most intrusive part of the searches that defined the question before the Supreme Court.  See id. at 558, 99 S. Ct. at 1884.  The Court acknowledged that of the five MCC practices before it, the blanket policy of requiring body cavity inspections after each contact visit with anyone from the outside "instinctively gives us the most pause."  Id.  But the Court did not pause long.  It quickly demolished, in just three paragraphs and an equal number of footnotes, the arguments that the policy violated the Fourth Amendment.  Id. at 558–60, 99 S. Ct. at 1884–85.

The Supreme Court did not hold that inmates at a detention facility had any Fourth Amendment rights to begin with.  It only assumed that they did.  Id. at 558, 99 S. Ct. at 1884 ("However, assuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility . . . .").  Even with that assumption, however, the Court concluded that the body cavity inspection searches after every contact visit were constitutionally permissible because the Fourth Amendment "prohibits only unreasonable searches, and under the circumstances, we do not believe that these searches are unreasonable."  Id. (citation omitted).

The Court explained that the reasonableness of a search cannot be determined by "precise definition or mechanical application," but instead "requires

15

a balancing of the need for the particular search against the invasion of personal rights that the search entails." Id. at 559, 99 S. Ct. at 1884. In balancing those interests there are four factors courts must consider: "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id.

As for the first factor, the Supreme Court did not "underestimate the degree to which these searches may invade the personal privacy of inmates." Id. at 560, 99 S. Ct. at 1885. It described how intrusive the searches were when it described how they were performed. Id. at 558 n.39, 99 S. Ct. at 1884 n.39. And it quoted the Second Circuit's view that the searches were a "'gross violation of personal privacy.'" Id. at 558, 99 S. Ct. at 1884 (quoting Wolfish, 573 F.2d at 131). As for the second factor, the Court did not "doubt, as the District Court noted, that on occasion a security guard may conduct the search in an abusive fashion." Id. at 560, 99 S. Ct. at 1885. Such abuses are not to be condoned. Id. The searches must be conducted in a reasonable manner, but the Court recognized that "we deal here with the question whether visual body-cavity inspections . . . can ever be conducted on less than probable cause." Id. (The emphasized "ever" served to underscore the assumption that the searches will be conducted in a non-abusive, reasonable manner.)

16

The Supreme Court answered that question in the affirmative, and the reason it did so was the combined weight of the third and fourth factors—the justification for the searches and the place they were conducted. Those two factors merged into one heavy consideration because the searches took place in a detention facility, and the justification for them was the critically important security needs of the facility. As the Court explained: "A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence." Id. at 559, 99 S. Ct. at 1884. The Court viewed that factor as a critical one even though the record indicated only one instance in three years "where an MCC inmate was discovered attempting to smuggle contraband into the institution on [her] person." Id. at 559, 99 S. Ct. at 1885; see also Wolfish, 439 F. Supp. at 147. That fact, the Court believed, "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises." Bell, 441 U.S. at 559, 99 S. Ct. at 1885. The Court noted that officials had testified "that visual cavity searches were necessary not only to discover but also to deter the smuggling of weapons, drugs, and other contraband into the institution." Id. at 558, 99 S. Ct. at 1884.

The district court's position that less intrusive alternatives, such as metal

17

detectors, should be used instead of the body cavity inspections was rejected. For one thing the Supreme Court was not ready to concede that lesser alternative analysis has any place in the Fourth Amendment area. Id. at 559 n.40, 99 S. Ct. at 1885 n.40 ("'[T]he logic of such elaborate less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.'" (alteration in original) (quoting United States v. Martinez-Fuerte, 428 U.S. 543, 556–57 n.12, 96 S. Ct. 3074, 3082 n.12 (1976)). For another thing the Court decided that, even assuming lesser alternatives may be considered, the metal detectors suggested by the district court would not be as effective as visual body cavity inspections because metal detectors cannot detect currency, drugs, and other nonmetallic contraband. Id.

The bottom line of the Bell decision is that, after "[b]alancing the significant and legitimate security interests of the institution against the privacy interests of the inmates," the Supreme Court concluded that the visual body cavity inspections—the most intrusive part of the strip searches in that case—were reasonable under the Fourth Amendment. Id. at 559–60, 99 S. Ct. at 1884–85. The policy the Court upheld required that searches be conducted on every inmate after each contact visit, even without the slightest cause to suspect that the inmate was concealing contraband. Id. at 558, 99 S. Ct. at 1884.

18

## C.

We are aware that some courts have interpreted the Bell decision as requiring, or at least permitting lower courts to require, reasonable suspicion as a condition for detention facility strip searches, especially those that involve visual body cavity inspections. See, e.g., Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997) ("Balancing these interests, courts have concluded that, to be reasonable under Wolfish, strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons. . . . Accordingly, it is clear that at least the reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context as well." (citation omitted)); Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir. 1993) ("In this case, it is undisputed that plaintiffs were arrested for minor traffic violations and were awaiting bail, that jail officials had no reasonable suspicion that these particular arrestees were likely to be carrying or concealing weapons or drugs, and that plaintiffs were searched solely because the blanket policy required all detainees to be subjected to a strip search. Every circuit court, including our own, which has considered the above circumstances under the Wolfish balancing test has concluded that a search under these circumstances is unconstitutional."). We ourselves have done that. Wilson, 251 F.3d at 1343 ("Because Wilson was strip

19

searched absent reasonable suspicion, we hold that the search of Wilson, as well as the jail's policy authorizing her search, violated the Fourth Amendment prohibition against unreasonable searches and seizures."). Those decisions misread Bell as requiring reasonable suspicion.

The Bell decision, correctly read, is inconsistent with the conclusion that the Fourth Amendment requires reasonable suspicion before an inmate entering or re-entering a detention facility may be subjected to a strip search that includes a body cavity inspection. And the decision certainly is inconsistent with the conclusion that reasonable suspicion is required for detention facility strip searches that do not involve body cavity inspections.

First, and most fundamentally, the Court in Bell addressed a strip search policy, not any individual searches conducted under it. The Court spoke categorically about the policy, not specifically about a particular search or an individual inmate. See Bell, 441 U.S. at 560, 99 S. Ct. at 1885; see also Hudson v. Palmer, 468 U.S. 517, 538, 104 S. Ct. 3194, 3206 (1984) (O'Connor, J., concurring) (citing Bell for the proposition that "[i]n some contexts, . . . the Court has rejected the case-by-case approach to the 'reasonableness' inquiry in favor of an approach that determines the reasonableness of contested practices in a categorical fashion"). The policy that the Court categorically upheld in Bell

20

applied to all inmates, including those charged with lesser offenses and even those charged with no wrongdoing at all who were being held as witnesses in protective custody. See Bell, 441 U.S. at 524, 99 S. Ct. at 1866. The policy did not require individualized suspicion. Just the opposite. It called for a search of every inmate returning from a contact visit regardless of whether there was any reasonable suspicion to believe that the inmate was concealing contraband. See id. at 558, 99 S. Ct. at 1884.

The Supreme Court said: "[A]ssuming for present purposes that inmates, both convicted prisoners and pretrial detainees, retain some Fourth Amendment rights upon commitment to a corrections facility, we nonetheless conclude that these searches do not violate that Amendment." Id. (citations omitted, emphasis added). When the Court stated that "these searches" do not violate the Fourth Amendment, it obviously meant the searches that were before it, and those searches were conducted under a blanket policy without reasonable suspicion. It really is that simple.

If more is needed, it can be found in Justice Powell's dissenting opinion in Bell, the significance of which has been underappreciated.[1] Justice Powell

---

[1] Some, but by no means most, of the discussion in this part of the opinion is borrowed, occasionally verbatim, from Evans, 407 F.3d at 1283–92 (Carnes, J., concurring specially), with the gracious consent of the author of that opinion.

21

dissented for one and only one reason, which was that the Court did not require

reasonable suspicion for conducting the strip searches in that case. His opinion, a

model of brevity, states in its entirety:

> I join the opinion of the Court except the discussion and holding
> with respect to body-cavity searches. In view of the serious intrusion
> on one's privacy occasioned by such a search, I think at least some
> level of cause, such as a reasonable suspicion, should be required to
> justify the anal and genital searches described in this case. I therefore
> dissent on this issue.

Bell, 441 U.S. at 563, 99 S. Ct. at 1886 (Powell, J., concurring in part and

dissenting in part). Obviously, Justice Powell would not have dissented from a

holding that the Court had not made.

Granted, it can be risky to place too much reliance on dissenting opinions

because they sometimes take a Chicken Little or doomsday approach, exaggerating

aspects of the majority opinion in order to have a bigger target to attack. Justice

Powell's dissent in Bell is not of that type. It does not attack the majority opinion.

Instead, it states in three sentences that it disagrees with only one aspect of the

decision and that is the failure to require "some level of cause, such as a reasonable

suspicion" before the "anal and genital searches described in this case" can be

performed. Id. If the majority had required reasonable suspicion for body cavity

inspection strip searches of pretrial detainees, Justice Powell would not have

dissented at all. And Justice Marshall would have had one less thing to complain

22

about in his separate dissenting opinion.  Id. at 578, 99 S. Ct. at 1894 (Marshall, J., dissenting) ("Here, the searches are employed absent any suspicion of wrongdoing.").

From his perspective inside the Court, Justice Powell (like Justice Marshall) had a far better sense of the majority's decision in Bell than any of us lower court judges could, and he understood that the decision permitted the body cavity inspection strip searches without reasonable suspicion.  Confronted with the dissenting statements, the majority, if it had not intended to permit those searches of pretrial detainees without reasonable suspicion, would have noted as much in its opinion.  It would have been a simple matter to do that.  The majority, however, did not change its opinion to state that reasonable suspicion was required because Justice Powell's (and Justice Marshall's) reading of its opinion was accurate.  The Bell decision means that the Fourth Amendment does not require reasonable suspicion for this type of strip search in detention facilities.

The decisions that conclude to the contrary not only disregard the existence of the dissenting opinions, but they also ignore one momentous fact of Franciscan simplicity:  The Bureau of Prisons' policy has not changed in any material respect.  Under that policy body cavity strip searches without reasonable suspicion are conducted today just as they were when the Bell lawsuit was brought.  Indeed, the

23

year after the Bell decision the Bureau enshrined the policy in a regulation, where it remains to this day. The policy still subjects inmates to strip searches involving "a visual inspection of all body surfaces and body cavities" whenever there is either a "reasonable belief" or "a good opportunity for concealment has occurred." Fed. Bureau of Prisons, U.S. Dep't of Justice, Program Statement No. 5521.05, Searches of Housing Units, Inmates, and Inmate Work Areas 6(b)(1) (1997) (quoting 28 C.F.R. § 552.11(c)(1)). And the policy specifies that "a good opportunity for concealment has occurred," and the searches are to be performed, when an inmate is processed into the facility for the first time, when an inmate returns from having any contact with the public, such as during a contact visit, and so on. Id. That policy applies to federal facilities nationwide. See Bell, 441 U.S. at 558, 99 S. Ct. at 1884. Yet, so far as we can tell, in the nearly thirty years since the Bell decision was issued no court has attempted to enjoin the Bureau of Prisons from performing body cavity inspection strip searches without reasonable suspicion. The reason should be obvious.

If the Supreme Court's decision in Bell had required, or permitted lower courts to require, reasonable suspicion before body cavity strip searches could be conducted at detention facilities, the district court in that case would have done so on remand. However, the court must have recognized that the Supreme Court's

24

decision did not permit it to require reasonable suspicion before the searches could be performed. All other courts should recognize as much.

Some courts fail to recognize that because they misread one sentence from the Bell opinion. See, e.g., Swain, 117 F.3d at 6; Weber v. Dell, 804 F.2d 796, 800 (2d Cir. 1986). In that sentence the Supreme Court said: "But we deal here with the question whether visual body-cavity inspections as contemplated by the [facility's] rules can ever be conducted on less than probable cause." Bell, 441 U.S. at 560, 99 S. Ct. at 1885. The Court answered "yes," but neither the question nor the answer compels the conclusion that "less than probable cause" means "reasonable suspicion." The absence of reasonable suspicion is also "less than probable cause." The context of that sentence, which we have already discussed, see supra at 16, is also important. In the sentences that came before that one the Court had acknowledged that some guards may conduct the visual body cavity searches in an abusive fashion. Bell, 441 U.S. at 560, 99 S. Ct. at 1885; see also Wolfish, 439 F. Supp. at 147. The "ever" referred to searches that did not involve abuse. Bell, 441 U.S. at 560, 99 S. Ct. at 1885.

Interpreting the quoted sentence from Bell to require reasonable suspicion puts more weight on it than the words will bear. Doing so also ignores the rest of the majority opinion as well as the dissenters' interpretation of it, see id. at 563, 99

25

S. Ct. at 1886 (Powell, J., concurring in part and dissenting in part); id. at 578, 99 S. Ct. at 1894 (Marshall, J., dissenting), an interpretation that the majority implicitly accepted by not modifying its opinion to require reasonable suspicion. And it ignores the fact that the same searches that were being conducted without reasonable suspicion at MCC when Bell was decided are still being conducted without reasonable suspicion there and at every other federal detention facility in the country.[2]

One other point is worth discussing. In judging the constitutionality of strip searches for detainees, some other circuits draw a distinction between whether the person has been arrested on a felony charge or just for a misdemeanor or some other lesser violation. See, e.g., Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Stewart v. Lubbock County, Tex., 767 F.2d 153, 156–57 (5th Cir. 1985); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1041 n.1 (9th Cir. 1999) (en banc); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir. 1983).

While those decisions vary in detail around the edges, the picture they paint is essentially the same. The arrestee is charged with committing a misdemeanor or some other lesser violation and, while being booked into the detention facility, she

---

[2] The parties have not cited and we have been unable to find any post-Bell decision enjoining any type of strip search at any federal detention facility.

26

is subjected to a strip search pursuant to the facility's policy. She later sues the officials asserting that the search was unconstitutional because the guards did not have any reasonable basis for believing that she was hiding contraband on her person. See, e.g., Mary Beth G., 723 F.2d at 1266. In each cited case, the court of appeals concludes that because the plaintiffs were "minor offenders who were not inherently dangerous," id. at 1272, detention officials could conduct a strip search only where there was "a reasonable suspicion that the individual arrestee is carrying or concealing contraband," Giles, 746 F.2d at 617. In each of the cases where reasonable suspicion was lacking, the search is held to violate the Fourth Amendment.

Those decisions are wrong. The difference between felonies and misdemeanors or other lesser offenses is without constitutional significance when it comes to detention facility strip searches. It finds no basis in the Bell decision, in the reasoning of that decision, or in the real world of detention facilities. The Supreme Court made no distinction in Bell between detainees based on whether they had been charged with misdemeanors or felonies or even with no crime at all. Instead, the policy that the Court treated categorically, and upheld categorically, was one under which all "[i]nmates at all Bureau of Prison facilities, including the MCC, are required to expose their body cavities for visual inspection as a part of a

27

strip search conducted after every contact visit with a person from outside the institution." Bell, 441 U.S. at 558, 99 S. Ct. at 1884. It was a blanket policy applicable to all.

Among the "[i]nmates at all Bureau of Prison facilities, including the MCC," were detainees facing only lesser charges, people incarcerated for contempt of court, and witnesses in protective custody who had not been accused of doing anything wrong. See id. at 524 & n.3, 558, 99 S. Ct. at 1866 & n. 3, 1884. The MCC was hardly a facility where all of the detainees were "awaiting trial on serious federal charges," as some of the opinions incorrectly state.[3] See, e.g., Mary Beth G., 723 F.2d at 1272. It is on that basis that some of the decisions involving county jails erroneously distinguish what they describe as the exaggerated need for strip searches at that type of facility from the real need for them at federal facilities.[4] Id.

_____

[3] Nor was the MCC facility some special sort of seething cauldron of criminality. The Supreme Court described it this way: "The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the most advanced and innovative features of modern design of detention facilities." Bell, 441 U.S. at 525, 99 S. Ct. at 1866. Yet, the Supreme Court found that "serious security dangers" warranted the strip search policy at MCC and all federal detention facilities. Id. at 559, 99 S. Ct. at 1884.

[4] Even if we were to buy into that distinction, which we do not, it would not make any difference in this case. The Fulton County Jail is a large detention facility, housing about 2,900 inmates, some of whom are charged with or have been convicted of felonies. (See R6:78:¶102); see also Foster v. Fulton County, Ga., 223 F. Supp. 2d 1292, 1294 (N.D. Ga. 2002); Foster v. Fulton County, Ga., 223 F. Supp. 2d 1301, 1308 (N.D. Ga. 2002).

The need for strip searches at all detention facilities, including county jails, is not exaggerated.  Employees, visitors, and (not least of all) the detained inmates themselves face a real threat of violence, and administrators must be concerned on a daily basis with the smuggling of contraband by inmates accused of misdemeanors as well as those accused of felonies.  See Clements v. Logan, 454 U.S. 1304, 1305, 102 S. Ct. 284, 286 (Rehnquist, Circuit Justice) (noting that the jail's strip search policy had been "adopted after the shooting of a deputy by a misdemeanant who had not been strip-searched"), vacated, 454 U.S. 1117, 102 S. Ct. 961 (1981); Johannes v. Alameda County Sheriff's Dep't, No. C 04-458MHP, 2006 WL 2504400, at *4–6  (N.D. Cal. Aug. 29, 2006) (discussing in statistical detail as well as practical terms the contraband problem at a large county jail and the usefulness of strip searches in combating it); Dodge v. County of Orange, 282 F. Supp. 2d 41, 46–49 (S.D.N.Y. 2003) (discussing testimony that strip searches were essential to prevent gangs from smuggling in contraband to the county jail), appeal dismissed, 103 F. App'x 688 (2d Cir. 2004).  Even some of the circuits that have required reasonable suspicion for searches of those arrested for misdemeanors concede that there have been instances where contraband was smuggled into a jail by detainees facing only misdemeanor or other lesser charges.  See, e.g., Mary Beth G., 723 F.2d at 1272–73.

Then there is the fact that gang members commit misdemeanors as well as felonies. In one county jail, for example, fifty percent of those being held on "misdemeanor or lesser charges" were gang members. Dodge, 282 F. Supp. 2d at 48 & n.9 (citing figures from 2002). "Gang members are often more violent, dangerous, and manipulative than other inmates, regardless of the nature of the charges against them." Id. at 48. Moreover, some gang members "attempt to coerce family members or to coerce, cajole, or intimidate lesser violators into smuggling contraband into the facility." Id. To make matters worse, "officials at a county jail . . . usually know very little about the new inmates they receive or the security risks they present at the time of their arrival." Id. The officials usually have no way of knowing whether someone coming into the detention facility after an arrest on a misdemeanor or other minor offense is only a minor offender or is also a gang member who got himself arrested so that he could serve as a mule smuggling contraband in to other members.

These reasons support the expert opinion of jail administrators that all of those who are to be detained in the general population of a detention facility should be strip searched when they enter or re-enter it. Id. at 49 ("All jail personnel who testified at this trial, including plaintiffs' expert, Robert Joseph DeRosa, testified that, if they could, they would strip search every newly arrived inmate, regardless

30

of what brought him or her to their facility, in order to minimize the risk of introduction of contraband.").

The Supreme Court has instructed us that jailers and corrections officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell, 441 U.S. at 547, 99 S. Ct. at 1878. It has also explained that "judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial." Id. at 548, 99 S. Ct. at 1879 (citing Procunier v. Martinez, 416 U.S. 396, 405, 94 S. Ct. 1800, 1807 (1974)). Decisions that carve out misdemeanor arrestees at county facilities for special treatment do not afford those who run detention facilities the "wide-ranging deference" the Supreme Court has mandated. The courts issuing those decisions have also failed to explain why misdemeanor arrestees in a county detention facility are entitled to more favorable Fourth Amendment treatment than those being detained for contempt of court or as witnesses in protective custody at a federal detention facility were afforded by the Supreme Court in Bell.

31

The decisions acknowledging Bell but reaching a contrary result are clothed in the language of distinction and difference, but at least one of them appeared to the author of the Bell decision himself to be thinly disguised defiance. In Clements, then Justice Rehnquist issued a stay of the decision in Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981). Clements, 454 U.S. at 1310, 102 S. Ct. at 288 (Rehnquist, Circuit Justice). The court of appeals had decided that the strip search of a woman who was booked into the county jail on a charge of driving while intoxicated violated the Fourth Amendment. As Justice Rehnquist saw it, the Fourth Circuit had "recited from Bell v. Wolfish the general standard by which searches are judged under the Fourth Amendment, but it chose to ignore the Court's application of that standard to the practice of conducting strip-searches of persons detained after being charged with a crime." Id. at 1309, 102 S. Ct. at 288. In lambasting what the court of appeals had done, he complained: "In short, the Court of Appeals decision reads as if Bell v.Wolfish had never been decided. Much as that may have been the desire of the lower court, the decision is authoritative precedent and I believe it clearly dictates a contrary result in this case." Id. at 1310, 102 S. Ct. at 288.[5] We recognize the Bell decision as

_____

[5] The Supreme Court vacated the stay that Justice Rehnquist had issued to permit the Court to consider the certiorari petition, Clements, 454 U.S. 1117, 1117, 102 S.Ct. 961, 961 (1981), and then denied the petition, Clements, 455 U.S. 942, 942, 102 S.Ct. 1435, 1435 (1982). Our dissenting colleague finds this fact "highly salient" because of her mistaken belief that the

authoritative precedent and reach the result it dictates in this case.

---

denial of certiorari and vacation of the stay means that "Justice Rehnquist's reading of Bell was rejected by the Supreme Court." Dissenting op. at 4. The implicit premise of the syllogism that informs her misunderstanding about this point is that the denial of certiorari or vacation of a stay is an indication of the Court's view on the merits. It is not.

For at least eight decades the Supreme Court has instructed us, time and again, over and over, that the denial of certiorari does not in any way or to any extent reflect or imply any view on the merits. See, e.g., United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 182 (1923) ("The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times."); House v. Mayo, 324 U.S. 42, 48, 65 S.Ct. 517, 521 (1945) ("[A]s we have often said, a denial of certiorari by this Court imports no expression of opinion upon the merits of a case."), overruled on other grounds by Hohn v. United States, 524 U.S. 236, 118 S.Ct. 1969 (1998); Maryland v. Baltimore Radio Show, 338 U.S. 912, 919, 70 S.Ct. 252, 255 (1950) (Frankfurter, J., opinion respecting the denial of certiorari) ("Inasmuch, therefore, as all that a denial of a petition for a writ of certiorari means is that fewer than four members of the Court thought it should be granted, this Court has rigorously insisted that such a denial carries with it no implication whatever regarding the Court's views on the merits of a case which it has declined to review. The Court has said this again and again; again and again the admonition has to be repeated."); Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 365 n.1, 93 S.Ct. 647, 650 n.1 (1973) (reiterating "the well-settled view that denial of certiorari imparts no implication or inference concerning the Court's view of the merits."); Teague v. Lane, 489 U.S. 288, 296, 109 S.Ct. 1060, 1067–68 (1989) ("As we have often stated, the denial of a writ of certiorari imports no expression of opinion upon the merits of the case. The variety of considerations that underlie denials of the writ counsels against according denials of certiorari any precedential value.") (citations, marks, and brackets omitted); Evans v. Stephens, 544 U.S. 942, 942, 125 S.Ct. 2244, 2244 (2005) (Stevens, J., opinion respecting the denial of certiorari) ("On several occasions in the past, I have found it appropriate to emphasize the fact that a denial of certiorari is not a ruling on the merits of any issue raised by the petition.").

Because the denial of certiorari implies no view of the merits, the denial or vacation of a stay that was entered to permit consideration of a certiorari petition logically cannot imply any view of the merits either. We have previously held exactly that at least twice. Ford v. Strickland, 734 F.2d 538, 542 (11th Cir. 1984) (reiterating that the Supreme Court's "denial of a stay pending filing and disposition of a writ of certiorari imports no more than a decision to deny certiorari, which does not express any views on the merits of the claims presented.") (citation and internal marks omitted); Ritter v. Smith, 726 F.2d 1505, 1511 (11th Cir. 1984) (holding that the Supreme Court's vacation of a stay, like its denial of a stay, pending certiorari "imports no more than a decision to deny certiorari, which does not express any views on the merits of the claims presented," and that is true even when it was done in a co-defendant's case).

33

**D.**

The strip searches of the five plaintiffs before us did not include body cavity inspections. Indeed, the full body visual searches performed on them are exactly what even the district court in <u>Bell</u> grudgingly recognized would be reasonable.[6] See <u>Bell</u>, 441 U.S. at 558, 99 S. Ct. at 1884; <u>Wolfish</u>, 573 F.2d at 131; <u>Wolfish</u>, 439 F. Supp. at 148. If these plaintiffs had been strip searched after contact visits at the Fulton County Jail, instead of as part of the booking process, their claims would not have a prayer of surviving even the most cursory reading of <u>Bell</u>. Their best hope for distinguishing <u>Bell</u> lies in the fact that they were strip searched as part of the booking process instead of after contact visits.

Of course, an inmate's initial entry into a detention facility might be viewed as coming after one big and prolonged contact visit with the outside world. There is no denying that arrestees entering a detention facility usually have had plenty of contact with outsiders, most having been outsiders themselves until they were

---

[6] Indeed, the searches of these plaintiffs came immediately after each one had taken a group shower with the other incoming detainees of the same sex and before they put on their jail jumpsuit. (R6:78:¶¶181–83, 238–40.) The strip searches consisted of one or more guards viewing the front and back sides of the plaintiffs' naked bodies. (<u>Id.</u> ¶¶183, 240.) The exposure of flesh was no greater than occurred in the shower itself. We do not think it is open to serious dispute that inmates of the same sex may be required to shower together and that guards of that sex may watch them while they are showering to prevent any misconduct. <u>See generally,</u> <u>Oliver v. Scott</u>, 276 F.3d 736, 746 (5th Cir. 2002); <u>Johnson v. Phelan</u>, 69 F.3d 144, 145–46 (7th Cir. 1995); <u>Timm v. Gunter</u>, 917 F.2d 1093, 1101–02 (8th Cir. 1990). It necessarily follows that this type of visual strip search is not unconstitutional.

34

arrested.  What the plaintiffs argue is that with contact visits detainees have enough notice and time to arrange for contraband to be brought to them, while that is not the case with newly arriving arrestees.  Arrests, they insist, are not anticipated and as a result provide no chance for one to obtain and conceal contraband.

The factual premise of this argument is unsupportable.  Not everyone who is arrested is surprised, seized, and slapped into handcuffs without a moment's notice. Some people surrender when they are notified that a warrant for them is outstanding.  Those who do not turn themselves in often have notice that officers are coming to arrest them.  Even those in a vehicle who are pulled over and arrested may have time to hide items on their person before the officer reaches the car door.  Then there are those who deliberately get themselves arrested. Demonstrators or protestors engaged in civil disobedience are one example. Another example, as we mentioned earlier, is gang members who get themselves arrested just so they can smuggle in contraband.  They have all the time they need to plan their arrests and conceal items on their persons.

The point is that there are plenty of situations where arrestees would have had at least as much opportunity to conceal contraband as would inmates on a contact visit, which is the situation Bell involved.  See Wolfish, 439 F. Supp. at 147 ("[I]nmates and their visitors are in full view during the [contact] visits and

35

fully clad. The secreting of objects in rectal or genital areas becomes in this situation an imposing challenge to nerves and agility.").

In conclusion, assuming that arrestees being booked into a jail or detention facility retain some Fourth Amendment rights, see Bell, 441 U.S. at 558, 99 S. Ct. at 1884,[7] those rights are not violated by a policy or practice of strip searching each one of them as part of the booking process, provided that the searches are no more intrusive on privacy interests than those upheld in the Bell case. We also assume, of course, that the searches are not conducted in an abusive manner. Because the part of our Wilson decision finding a constitutional violation under the facts of that case, Wilson, 251 F.3d at 1343, is inconsistent with our reasoning here, we overrule it. We also disavow any dicta to the same effect as the Wilson decision. See, e.g., Skurstenis, 236 F.2d at 682.

## III.

Insofar as the district court dismissed the Fourth Amendment point-of-entry strip search claims of the "the Arrestee Strip Search Class (AR Group)," we AFFIRM its decision. We REMAND the case back to the panel to apply the

---

[7] This assumption and our reasoning make it unnecessary to decide whether, as the defendants insist, Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194 (1984), means that inmates have no right to privacy. We do note, without endorsement or criticism, that one of our decisions concludes that jail inmates retain a right to bodily privacy that implicates the Fourth Amendment. See Fortner v. Thomas, 983 F.2d 1024, 1026 (11th Cir. 1993) ("As a matter of first impression in this circuit, we hold that a prisoner retains a constitutional right to bodily privacy.").

36

principles we have discussed in this opinion to the other two groups of plaintiffs in this case, which it denominated the "Alpha Strip Search Class (AL Group)" and the "Court Return Strip Search Class (CR Group)."

EDMONDSON, Circuit Judge, Concurring:

I do not write in a complaining spirit. I unhesitatingly concur in the Court's judgment and in almost all of today's Court opinion. I write separately because I think it is jurisprudentially unsound to look at a Justice's dissenting opinion to determine what the Supreme Court has decided in a case.

To the degree that our Court today seems to make some verifying use--I think unnecessarily--of this approach, I cannot join it.

BARKETT, Circuit Judge, Dissenting:

I believe the majority misreads <u>Bell</u> as justifying a balancing test that is satisfied by the mere fact that the strip searches take place in jails. The complaint alleges the automatic strip-searching, in a group, of arrestees charged with petty misdemeanors when there is no cause whatsoever to suspect the individuals of concealing contraband. No justification for these invasive searches is alleged and there are no other facts before us at this juncture to permit upholding these searches under the <u>Bell</u> balancing test. Under the longstanding, widely-held reading of <u>Bell</u>, with which I agree, the plaintiffs have stated a valid constitutional claim for a violation of the Fourth Amendment.

## A. Applying the <u>Bell</u> Balancing Test to the Complaint

Like the majority, I recognize and appreciate the deference due to jail administrators as they fulfill their charge of ensuring security in jails, not only for the jail officials but also for the inmates. <u>See</u> <u>Bell v. Wolfish</u>, 441 U.S. 520, 547–48 (1979). At the same time, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." <u>Id.</u> at 545. This principle applies with at least as much force to individuals detained prior to their trial on petty misdemeanor charges such as failing to pay child support, driving without a license, or trespassing. <u>See id.</u> These protections,

39

such as the right to be free from degrading, humiliating, and dehumanizing treatment and the right to bodily integrity, include protection against forced nakedness during strip searches in front of others.  See Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006) ("We have reaffirmed the privacy rights of prisoners emphasizing the harm of compelled nudity." (citing Padgett v. Donald, 401 F.3d 1273, 1281 (11th Cir. 2005))).[1]

I recognize that even these rights can be circumscribed given adequate cause.  The question is whether there is adequate cause to permit the intrusive searches of these arrestees.  The Supreme Court in Bell instructed the lower courts to answer that question by considering the following four factors: (1) the

---

[1] Additionally, in Justice v. City of Peachtree City, 961 F.2d 188, 192 (11th Cir. 1992), we stated:

> It is axiomatic that a strip search represents a serious intrusion upon personal rights.  In Mary Beth G., the court referred to strip searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission."  Mary Beth G., 723 F.2d at 1272.  Another court described the indignity individuals arrested for minor offenses experience in the following manner:
>
> > The experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state, in an enclosed room inside a jail, can only be seen as thoroughly degrading and frightening.  Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event.
>
> John Does 1-100 v. Boyd, 613 F. Supp. 1514, 1522 (D. Minn. 1985).  One commentator has gone so far as to describe strip searches as "visual rape."  See Shuldiner, Visual Rape:  A Look at the Dubious Legality of Strip Searches, 13 J. Marshall L. Rev. 278 (1980).

justification for initiating the search; (2) the scope of the particular intrusion; (3) the manner in which the search is conducted; and (4) the place in which it is conducted.  441 U.S. at 559.  It did so based on a fully developed trial record, which detailed the procedure in place, the asserted justifications for the procedure, and the alleged violations of the plaintiffs' constitutional rights.  Id. at 528, 559.

For almost thirty years, circuit courts have followed the Bell Court's instructions and, until today, universally held that reasonable suspicion is necessary to constitutionally justify the types of searches before us.  See Wilson v. Jones, 251 F.3d 1340, 1343 (11th Cir. 2001); Swain v. Spinney, 117 F.3d 1, 7 (1st Cir. 1997); Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Weber v. Dell, 804 F.2d 796, 804 (2d Cir. 1986); Jones v. Edwards, 770 F.2d 739, 741–42 (8th Cir. 1985); Stewart v. Lubbock County, 767 F.2d 153, 156–57 (5th Cir. 1985); Giles v. Ackerman, 746 F.2d 614, 617 (9th Cir. 1984), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc); Hill v. Bogans, 735 F.2d 391, 394–95 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1273 (7th Cir. 1983); Logan v. Shealy, 660 F.2d 1007, 1013 (4th Cir. 1981).

The Supreme Court has never found it necessary to contradict the unanimous view of the circuit courts that required reasonable suspicion for strip searches over

41

the past three decades.  Quite the opposite.  When the Court had the opportunity, it refused to do so.  In Logan v. Shealy, after a trial, the Fourth Circuit enjoined a detention center from applying its blanket policy of strip-searching all booked individuals.  660 F.2d at 1013.  The Fourth Circuit determined that the strip search of Logan—who was arrested for a DWI offense—had no "discernible relationship to security needs at the Detention Center that, when balanced against the ultimate invasion of personal rights involved, it could reasonably be thought justified." Id. As the majority notes, in an order staying the injunction issued by the Fourth Circuit, Justice Rehnquist, in an individual opinion as Circuit Justice,  strongly expressed his belief that the Fourth Circuit misapplied Bell by failing to give proper weight to the security concerns identified by the law enforcement officials as justification for the search.  Clements v. Logan, 454 U.S. 1304, 1309–10 (Rehnquist, Circuit Justice), vacated, 454 U.S. 1117 (1981).  However,  Justice Rehnquist's reading of Bell was rejected by the Supreme Court, as evidenced by the vacation of the stay and the denial of certiorari.  This is highly salient because, in essence, the majority's argument merely repackages the interpretation of Bell that Justice Rehnquist futilely advanced in Clements.

Today, the majority reads the balancing test out of Bell and effectively establishes a per se rule permitting automatic strip searches of all detainees,

42

regardless of their status, in the name of security and administrative convenience. But Bell did not validate strip searches in detention settings per se. 441 U.S. at 559; Roberts v. Rhode Island, 239 F.3d 107, 113 (1st Cir. 2001) ("Bell has not been read as holding that the security interests of a detention facility will always outweigh the privacy interests of the detainees." (quoting Dobrowolskyj v. Jefferson County, 823 F.2d 955, 957 (6th Cir. 1987))); Mary Beth G., 723 F.2d at 1272. Instead, the Supreme Court explained, "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Bell, 441 U.S. at 559 (emphasis added). As this language makes clear, the Bell balancing test is case-specific and there is no general rule rendering the allegations before us inadequate to state a claim.

Nor does the fact that Bell upheld a blanket policy, after a trial, mean that the Supreme Court implicitly rejected a finding that reasonable suspicion is ever necessary to justify strip searches or strip search policies. This is too broad a constitutional principle to derive from an allegedly implicit holding of the Supreme Court. A more reasonable interpretation would be that the Supreme Court did not need to address the issue because reasonable suspicion was present in the

43

evidentiary record based on the detainees' planned contact with outsiders knowing they would be returning to the general population of the detention center after the visit. Id. at 558; Shain v. Ellison, 273 F.3d 56, 64 (2nd Cir. 2001) ("Second, and more important, Bell authorized strip searches after contact visits, where contraband often is passed.").[2] Such a reading would be consistent with the Supreme Court's description of the issue as dealing only with the need for probable cause. Bell, 441 U.S. at 560.

The majority also reads too much into the dissents of Justice Powell and Justice Marshall to support its argument that the Supreme Court implicitly sanctioned strip searches without reasonable suspicion. The reading more consistent with judicial rules of construction is that Justice Powell wanted the Supreme Court to decide more than it was willing to decide, namely, to explicitly articulate a level of cause necessary to justify the searches. See Kennedy v. Los Angeles Police Dep't, 901 F.2d 702, 715 (9th Cir. 1990) (quoting Bell, 441 U.S. at

---

[2] Reading a finding of reasonable suspicion into Bell is consistent with the precedent in a number of circuit courts—including our own—that have found reasonable suspicion sufficient to justify strip searches of individuals based on the nature of the charged offense that led to their arrest or other behavioral indicators. See, e.g., Hicks v. Moore, 422 F.3d 1246, 1252 (11th Cir. 2005) ("We accept that a person's being charged with a crime of violence is sufficient to evoke reasonable suspicion that the person may be concealing weapons or contraband."); see also Thompson v. City of Los Angeles, 885 F.2d 1439, 1447 (9th Cir. 1989) (holding that reasonable suspicion existed to strip-search an inmate upon introduction to the general jail population based on nature of the charges); Arruda v. Fair, 710 F.2d 886, 887 (1st Cir. 1983) (upholding strip searches of inmates upon their return from the infirmary).

44

563 (Powell, J., concurring in part, dissenting in part)).  The <u>Bell</u> majority was willing to say that probable cause was not necessary but was unwilling to state any more than that.  This silence cannot be construed to mean that the Supreme Court rejected the notion that the Fourth Amendment requires reasonable suspicion to justify strip searches of misdemeanor detainees.  If the <u>Bell</u> Court had intended to restrict lower courts from making that determination, it would have just said so.

In the case before us, the majority purports to apply the <u>Bell</u> balancing test to the complaint.  However, the allegations of the complaint do not include any facts that support the majority's conclusion that justification exists for the strip searches of these appellants.  Facts regarding the jail administration's justification for the policy are simply absent because there is no evidentiary record at this stage.  Given this absence, it is no surprise that neither the Supreme Court nor any circuit court has found constitutional this type of strip-search policy on a motion to dismiss.[3]

The majority says that the policy is justified on the basis of generalized security concerns, citing the records of cases that describe contraband problems of specific detention facilities other than the Fulton County Jail.  Although generalized security concerns might be relevant in a <u>Bell</u> analysis, simply saying

---

[3] Several courts have noted the general problem of applying the <u>Bell</u> balancing test to affirm a dismissal of a complaint.  <u>See, e.g.</u>, <u>Beaulieu v. Ludeman</u>, No. 07-CV-1535, 2008 WL 2498241, at *12 (D. Minn. June 18, 2008) ("[T]his Court does not have before it any facts to assist it in evaluating the factors necessary to determine if the alleged blanket strip search policy in this case is appropriate.").

jails typically are dangerous places is not a sufficient "justification for initiating" the strip searches under <u>Bell</u>. Generalized security concerns cannot be enough to justify an infringement of such magnitude—an infringement that involves an intrusion of the most intimate sort. I believe the majority's reliance on factual findings unrelated to the specific situation at the Fulton County Jail is an abdication of our responsibility to weigh the significant competing interests—particularly the justification for the search—on the basis of specific facts.

To adequately weigh the justification for a search against the privacy concerns that <u>Bell</u> recognized, there has be an institution-specific justification for the policy. Should such justification be offered, deference might be due. There is a difference, however, between deference and abdication of our duty to perform the weighing function with which we have been charged. <u>See</u> <u>Kennedy</u>, 901 F.2d at 712 ("When litigants petition the federal courts to review the application of an institutional policy, the courts must proceed cautiously; the Supreme Court has sounded this warning emphatically and with considerable wisdom. Yet, at the same time, we must be equally careful not to abdicate our function as the guardians of the Constitution.").

Indeed, the Supreme Court in Bell specifically noted that deference is not due when there is "substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations." 441 U.S. at 548 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)). Automatically strip-searching all pretrial misdemeanor detainees absent any suspicion that such detainees pose a security threat and anything indicating they were aware that they were going to be arrested is the exaggerated response which Bell cautioned against.[4] "[A]rrest and confinement in the [county jail] are unplanned events, so the policy could not possibly deter arrestees from carrying contraband." Giles, 746 F.2d at 617.

These appellees differ significantly from those in Bell, where the strip-searched plaintiffs had advance knowledge of their return to the general jail population after their planned interactions with outsiders. Again, as other circuit courts have recognized, the reasonable need for inspection in the Bell scenario is simply not present after the unplanned arrest of individuals for petty misdemeanors unrelated to contraband. See, e.g., Shain, 273 F.3d at 64; Roberts, 239 F.3d at 111 ("[T]he deterrent rationale for the Bell search is simply less relevant given the essentially unplanned nature of an arrest and subsequent incarceration."); Giles,

_____

[4] And if, for example, Powell was such a threat, he would not have been committed to the Fulton County Jail for over twenty-four hours without being strip-searched. See Logan, 660 F.2d at 1013 (finding relevant that "when strip-searched, [the plaintiff] had been at the Detention Center for one and one-half hours without even a pat-down search").

746 F.2d at 617. The majority's assertion that pretrial detainees booked on petty misdemeanor charges might anticipate their arrests or that gang members might deliberately get arrested in order to smuggle weapons and drugs into jail is unwarranted speculation in this case. See generally Shain, 273 F.3d at 64 ("Unlike persons already in jail who receive contact visits, arrestees do not ordinarily have notice that they are about to be arrested and thus an opportunity to hide something. For the exceptions—for example, a person who is allowed to visit the bathroom unescorted before an arrest—reasonable suspicion may well exist.").

It is simply unreasonable to assume that individuals arrested on misdemeanor charges not giving rise to reasonable suspicion are going about their daily lives carrying contraband in such a way as to be discoverable only by a strip search. More to the point, it is an exaggerated response to strip-search all pretrial misdemeanor detainees on the basis of this speculative concern. Although easier and more convenient to simply subject all detainees to a blanket policy, the indiscriminate strip searches before us "cannot be justified simply on the basis of administrative ease in attending to security considerations." Roberts, 239 F.3d at 113 (quoting Logan, 660 F.2d at 1013); see also Chapman v. Nichols, 989 F.2d 393, 396 (10th Cir. 1993); see generally Reno v. Flores, 507 U.S. 292, 346 (1993) (Stevens, J., dissenting) (noting "the clear holding of our cases that 'administrative

48

convenience' is a thoroughly inadequate basis for the deprivation of core constitutional rights"). As the Ninth Circuit noted, intermingling alone is an insufficient justification because the practice is inherently "limited and avoidable." Giles, 746 F.2d at 619. And, to echo the concern voiced by the First Circuit, "[t]o place so much weight on one (potentially alterable) characteristic of the state prison system would gut the balancing approach endorsed by the Supreme Court in Bell . . . ." Roberts, 239 F.3d at 113.

Moreover, the current existence of less-intrusive alternatives to strip-searching is instructive in an assessment of the strength of the justification for the strip search policy. Metal detectors would be effective in discovering metallic weapons, discounting—at least, to some degree—the safety rationale. And, in this case, Powell points to the availability of new technology that could detect non-metallic contraband as well. Thus, assuming all else being equal, the search in the instant case is less reasonable than the one in Bell because of the present availability of less intrusive but equally effective means of achieving the important goal of jail safety.

The Bell test also requires courts to examine "the scope of the particular intrusion." Bell, 441 U.S. at 559. In its balancing, the Bell Court noted the highly intrusive nature of the strip and visual body-cavity searches. Id. at 560 ("We do

49

not underestimate the degree to which these searches may invade the personal privacy of inmates."). Even the least invasive strip search is highly intrusive. See, e.g., Kirkpatrick v. City of Los Angeles, 803 F.2d 485, 489–90 (9th Cir. 1986) ("[T]he fact that a strip search is conducted reasonably, without touching and outside the view of all persons other than the party performing the search, does not negate the fact that a strip search is a significant intrusion on the person searched.") (citation omitted); Thompson, 885 F.2d at 1446 ("The feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute."). Furthermore, as our own precedent recognizes, the general harm of forced nudity is often even greater when imposed upon a misdemeanor detainee given that such treatment "is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event." Justice, 961 F.2d at 192 (quoting John Does 1-100, 613 F. Supp. at 1522).

Turning to the remaining "manner" and "place" prongs of the Bell balancing test, I note that the strip searches in this case took place in rooms of 30 to 40 people as a matter of course.[5] The presence of others likewise militates against the reasonableness of the searches. See, e.g., Masters, 872 F.2d at 1250, 1254;

---

[5] In Bell, the policy subjected detainees to individual searches, although in practice, prisoners were sometimes searched in the presence of other inmates. See 441 U.S. at 577 (Marshall, J., dissenting).

Edwards, 770 F.2d at 742; Hill, 735 F.2d at 394.  The majority discounts this factor by noting that detainees in the Fulton County Jail are observed during a required group shower.  While the amount of exposed flesh might remain constant, the level of scrutiny surely differs when a jail official monitors the detainees during a group shower for physical altercations as opposed to when a jail official closely scrutinizes an individual for contraband during a strip search.  Moreover, the observation of group showers was not at issue in this case and had never been addressed by this circuit before the majority's cursory treatment of the issue in a footnote.

## B.  The Detainees in the Other Groups Were Entitled to Immediate Release

Finally, the majority remands the case back to the panel to apply the principles discussed in the opinion to the Alpha Strip Search Class (AL Group) and the Court Return Strip Search Class (CR Group).  Members of these groups were entitled to release and could not be legally detained any longer.  Powell v. Barrett, 496 F.3d 1288, 1314 (11th Cir. 2007), vacated, No. 05-16734 (11th Cir. Feb. 1, 2008) (recognizing "the privacy interests of the AL and CR Group Plaintiffs are the same, or arguably greater than, those of arrestees because they are entitled to release and the basis for their detention at the Jail no longer exists"); see also Cannon v. Macon County, 1 F.3d 1558, 1563 (11th Cir. 1993).  These individuals

51

should not have been subjected to any strip search, since their detention was no longer authorized under any possible legal principle. I also would note that today's decision should not be read as foreclosing future Fourth Amendment challenges in cases where a jail's search policy is more intrusive without a concomitant increase in the justification for the intrusion.